NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

-------

No. 08–559

-------

## E. K. McDANIEL, WARDEN, ET AL., PETITIONERS *v.* TROY BROWN

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 11, 2010]

PER CURIAM.

In *Jackson* v. *Virginia*, 443 U. S. 307 (1979), we held that a state prisoner is entitled to habeas corpus relief if a federal judge finds that "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Id.,* at 324. A Nevada jury convicted respondent of rape; the evidence presented included DNA evidence matching respondent's DNA profile. Nevertheless, relying upon a report prepared by a DNA expert over 11 years after the trial, the Federal District Court applied the *Jackson* standard and granted the writ. A divided Court of Appeals affirmed. *Brown* v. *Farwell*, 525 F. 3d 787 (CA9 2008). We granted certiorari to consider whether those courts misapplied *Jackson*. Because the trial record includes both the DNA evidence and other convincing evidence of guilt, we conclude that they clearly did.

I

Around 1 a.m. on January 29, 1994, 9-year-old Jane Doe was brutally raped in the bedroom of her trailer. Respondent Troy Brown was convicted of the crime. During and

since his trial, respondent has steadfastly maintained his innocence.[1]    He was, however, admittedly intoxicated when the crime occurred, and after he awoke on the following morning he told a friend "'he wished that he could remember what did go on or what went on.'" App. 309.

Troy and his brother Travis resided near Jane Doe in the same trailer park.  Their brother Trent and his wife Raquel lived in the park as well, in a trailer across the street from Jane Doe's.  Both Troy and Trent were acquainted with Jane Doe's family; Troy had visited Jane Doe's trailer several times.  Jane did not know Travis. The evening of the attack, Jane's mother, Pam, took Jane to Raquel and Trent's trailer to babysit while the three adults went out for about an hour.  Raquel and Trent returned at about 7:30 p.m. and took Jane home at about 9:30 p.m.  Pam stayed out and ended up drinking and playing pool with Troy at a nearby bar called the Peacock Lounge.  Troy knew that Jane and her 4-year-old sister were home alone because he answered the phone at the bar when Jane called for her mother earlier that evening.

Troy consumed at least 10 shots of vodka followed by beer chasers, and was so drunk that he vomited on himself while he was walking home after leaving the Peacock at about 12:15 a.m.  Jane called her mother to report the rape at approximately 1 a.m.  Although it would have taken a sober man less than 15 minutes to walk home, Troy did not arrive at his trailer until about 1:30 a.m.  He was wearing dark jeans, a cowboy hat, a black satin jacket, and boots.  Two witnesses saw a man dressed in dark jeans, a cowboy hat, and a black satin jacket stum-

_____

[1] He denied involvement when a police officer claimed (wrongly) that the police had found his fingerprints in Jane's bedroom, and he even denied involvement when the sentencing judge told him that acceptance of responsibility would garner him leniency.

bling in the road between the two trailers shortly after 1 a.m.

The bedroom where the rape occurred was dark, and Jane was unable to conclusively identify her assailant. When asked whom he reminded her of, she mentioned both Troy and his brother Trent. Several days after the rape, she identified a man she saw on television (Troy) as her assailant but then stated that the man who had sent flowers attacked her. It was Trent and Raquel who had sent her flowers, not Troy. She was unable to identify Troy as her assailant out of a photo lineup, and she could not identify her assailant at trial. The night of the rape, however, she said her attacker was wearing dark jeans, a black jacket with a zipper, boots, and a watch. She also vividly remembered that the man "stunk real, real bad" of "cologne, or some beer or puke or something." *Id.,* at 172–173.

Some evidence besides Jane's inconsistent identification did not inculpate Troy. Jane testified that she thought she had bitten her assailant, but Troy did not have any bite marks on his hands when examined by a police officer approximately four hours after the attack. Jane stated that her assailant's jacket had a zipper (Troy's did not) and that he wore a watch (Troy claimed he did not). Additionally, there was conflicting testimony as to when Troy left the Peacock and when Pam received Jane's call reporting the rape. The witnesses who saw a man stumbling between the two trailers reported a bright green logo on the back of the jacket, but Troy's jacket had a yellow and orange logo. Finally, because Jane thought she had left a night light on when she went to bed, the police suspected the assailant had turned off the light. The only usable fingerprint taken from the light did not match Troy's and the police did not find Troy's fingerprints in the trailer.

Other physical evidence, however, pointed to Troy. The police recovered semen from Jane's underwear and from

the rape kit. The State's expert, Renee Romero, tested the former and determined that the DNA matched Troy's and that the probability another person from the general population would share the same DNA (the "random match probability") was only 1 in 3,000,000. Troy's counsel did not call his own DNA expert at trial, although he consulted with an expert in advance who found no problems with Romero's test procedures. At some time before sentencing, Troy's family had additional DNA testing done. That testing showed semen taken from the rape kit matched Troy's DNA, with a random match probability of 1 in 10,000.

The jury found Troy guilty of sexual assault and sentenced him to life with the possibility of parole after 10 years.[2] On direct appeal, the Nevada Supreme Court considered Troy's claim that his conviction was not supported by sufficient evidence, analyzing "whether the jury, acting reasonably, could have been convinced of [Troy's] guilt beyond a reasonable doubt." *Brown* v. *Nevada*, 113 Nev. 275, 285, 934 P. 2d 235, 241 (1997) *(per curiam)*. The court rejected the claim, summarizing the evidence of guilt as follows:

> "Testimony indicated that Troy left the bar around

---

[2] Under Nevada law at the time of the trial, the jury, rather than the judge, imposed the sentence for a sexual assault crime if it found the assault resulted in substantial bodily harm. Nev. Rev. Stat. Ann. §200.366(3) (Michie 1992). For an assault resulting in substantial bodily harm, the jury had the option of sentencing Troy to life without the possibility of parole or to life with eligibility for parole after 10 years. §200.366(2)(a). The jury elected the more lenient sentence. The judge sentenced Troy to life with the possibility of parole after 10 years on a second count of sexual assault, to run consecutively. The Nevada Supreme Court reversed Troy's conviction for one count of child abuse on double jeopardy grounds, and ordered resentencing on the second sexual assault count. *Brown* v. *Nevada*, 113 Nev. 275, 934 P. 2d 235 (1997) *(per curiam)*. On resentencing, the judge imposed the same sentence as before.

12:15 a.m., that Troy lived relatively close to the bar, and that Troy lived very close to Jane Doe. Troy had enough time to get from the bar to Jane Doe's house and to assault Jane Doe before she made the telephone call to her mother at approximately 1:00 a.m. While Jane Doe could not identify her assailant, her description of his clothing was similar to what Troy was wearing; she also said that her assailant smelled like beer or vomit and testimony indicated that Troy had been drinking beer and had vomited several times that night. Furthermore, testimony indicated that Troy got home at approximately 1:30 a.m., which gave him enough time to assault Jane Doe. Additionally, [witnesses] testified that they saw someone resembling Troy in a black jacket and black hat stumbling in the road near Jane Doe's house at 1:05 a.m. Troy also washed his pants and shirt when he got home, arguably to remove the blood evidence from his clothes. Finally, the DNA evidence indicated that semen collected from Jane Doe's underwear matched Troy's and that only 1 in 3,000,000 other people had matching DNA (the second DNA test indicated that 1 in 10,000 people had matching DNA)." *Ibid.*, 934 P. 2d, at 241–242.

Respondent also argued on appeal that the trial court erred in failing to conduct a pretrial hearing to determine whether the DNA evidence was reliable. The court found respondent had not raised this issue in the trial court and concluded there was no plain error in the trial court's failure to conduct a hearing. *Id.*, at 284, 934 P. 2d, at 241.

In 2001, respondent sought state postconviction relief, claiming, *inter alia,* that his trial counsel was constitutionally ineffective for failing to object to the admission of the DNA evidence. He argued that there were a number of foundational problems with the DNA evidence, and that

if trial counsel had objected, the evidence would have been excluded or at least its importance diminished. He noted that because trial counsel "totally failed to challenge the DNA evidence in the case," counsel "failed to preserve valid issues for appeal." App. 1101. The state postconviction court denied relief, *id.,* at 1489–1499, and the Nevada Supreme Court affirmed, *id.,* at 1500–1506.

Respondent thereafter filed this federal habeas petition, claiming there was insufficient evidence to convict him on the sexual assault charges and that the Nevada Supreme Court's rejection of his claim was both contrary to, and an unreasonable application of, *Jackson*. He did not bring a typical *Jackson* claim, however. Rather than argue that the totality of the evidence admitted against him at trial was constitutionally insufficient, he argued that some of the evidence should be excluded from the *Jackson* analysis. In particular, he argued that Romero's testimony related to the DNA evidence was inaccurate and unreliable in two primary respects: Romero mischaracterized the random match probability and misstated the probability of a DNA match among his brothers. Absent that testimony, he contended, there was insufficient evidence to convict him.

In support of his claim regarding the accuracy of Romero's testimony, respondent submitted a report prepared by Laurence Mueller, a professor in ecology and evolutionary biology (Mueller Report). The District Court supplemented the record with the Mueller Report, even though it was not presented to any state court, because "the thesis of the report was argued during post-conviction." *Brown* v. *Farwell*, No. 3:03–cv–00712–PMP–VPC, 2006 WL 6181129, *5, n. 2 (Nev., Dec. 14, 2006).

Relying upon the Mueller Report, the District Court set aside the "unreliable DNA testimony" and held that without the DNA evidence "a reasonable doubt would exist in the mind of any rational trier of fact." *Id.*, at *7. The

court granted respondent habeas relief on his *Jackson* claim.[3]

The Ninth Circuit affirmed. 525 F. 3d 787. The court held the Nevada Supreme Court had unreasonably applied *Jackson*. 525 F. 3d, at 798; see 28 U. S. C. §2254(d)(1). The Court of Appeals first reasoned "the admission of Romero's unreliable and misleading testimony violated Troy's due process rights," so the District Court was correct to exclude it. 525 F. 3d, at 797. It then "weighed the sufficiency of the remaining evidence," including the District Court's "catalogu[e] [of] the numerous inconsistencies that would raise a reasonable doubt as to Troy's guilt in the mind of any rational juror." *Ibid*. In light of the "stark" conflicts in the evidence and the State's concession that there was insufficient evidence absent the DNA evidence, the court held it was objectively unreasonable for the Nevada Supreme Court to reject respondent's insufficiency-of-the-evidence claim. *Id.*, at 798.

We granted certiorari, 555 U. S. ___ (2009), to consider two questions: the proper standard of review for a *Jackson* claim on federal habeas, and whether such a claim may rely upon evidence outside the trial record that goes to the reliability of trial evidence.

## II

Respondent's claim has now crystallized into a claim about the import of two specific inaccuracies in the testimony related to the DNA evidence, as indicated by the Mueller Report. The Mueller Report does not challenge

---

[3] The District Court also granted habeas relief on respondent's claim that he was denied effective assistance of counsel with respect to his attorney's handling of the DNA evidence and failure to adequately investigate the victim's stepfather as an alternative suspect. *Brown* v. *Farwell*, No. 3:03–cv–00712–PMP–VPC, 2006 WL 6181129, *9–*10 (Nev., Dec. 14, 2006). The Court of Appeals did not consider those claims on appeal and they are not now before us.

Romero's qualifications as an expert or the validity of any of the tests that she performed. Mueller instead contends that Romero committed the so-called "prosecutor's fallacy" and that she underestimated the probability of a DNA match between respondent and one of his brothers.

The prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample. See Nat. Research Council, Comm. on DNA Forensic Science, The Evaluation of Forensic DNA Evidence 133 (1996) ("Let P equal the probability of a match, given the evidence genotype. The fallacy is to say that P is also the probability that the DNA at the crime scene came from someone other than the defendant"). In other words, if a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy. It is further error to equate source probability with probability of guilt, unless there is no explanation other than guilt for a person to be the source of crime-scene DNA. This faulty reasoning may result in an erroneous statement that, based on a random match probability of 1 in 10,000, there is a .01% chance the defendant is innocent or a 99.99% chance the defendant is guilty.

The Mueller Report does not dispute Romero's opinion that only 1 in 3,000,000 people would have the same DNA profile as the rapist. Mueller correctly points out, however, that some of Romero's testimony—as well as the prosecutor's argument—suggested that the evidence also established that there was only a .000033% chance that respondent was innocent. The State concedes as much. Brief for Petitioners 54. For example, the prosecutor

argued at closing the jury could be "99.999967 percent sure" in this case. App. 730. And when the prosecutor asked Romero, in a classic example of erroneously equating source probability with random match probability, whether "it [would] be fair to say . . . that the chances that the DNA found in the panties—the semen in the panties— and the blood sample, the likelihood that it is not Troy Brown would be .000033," *id.,* at 460, Romero ultimately agreed that it was "not inaccurate" to state it that way, *id.,* at 461–462.

Looking at Romero's testimony as a whole, though, she also indicated that she was merely accepting the mathematical equivalence between 1 in 3,000,000 and the percentage figure. At the end of the colloquy about percentages, she answered affirmatively the court's question whether the percentage was "the same math just expressed differently." *Id.,* at 462. She pointed out that the probability a brother would match was greater than the random match probability, which also indicated to the jury that the random match probability is not the same as the likelihood that someone other than Troy was the source of the DNA.

The Mueller Report identifies a second error in Romero's testimony: her estimate of the probability that one or more of Troy's brothers' DNA would match. Romero testified there was a 1 in 6,500 (or .02%) probability that one brother would share the same DNA with another. *Id.,* at 469, 472. When asked whether "that change[s] at all with two brothers," she answered no. *Id.,* at 472. According to Mueller, Romero's analysis was misleading in two respects. First, she used an assumption regarding the parents under which siblings have the lowest chance of matching that is biologically possible, but even under this stingy assumption she reported the chance of two brothers matching (1 in 6,500) as much lower than it is (1 in 1,024 under her assumption). Second, using the assumptions

Mueller finds more appropriate, the probability of a single sibling matching respondent is 1 in 263, the probability that among two brothers one or more would match is 1 in 132, and among four brothers it is 1 in 66. *Id.,* at 1583.

In sum, the two inaccuracies upon which this case turns are testimony equating random match probability with source probability, and an underestimate of the likelihood that one of Troy's brothers would also match the DNA left at the scene.

## III

Although we granted certiorari to review respondent's *Jackson* claim, the parties now agree that the Court of Appeals' resolution of his claim under *Jackson* was in error. See Brief for Respondent 2–3; Reply Brief for Petitioners 1. Indeed, respondent argues the Court of Appeals did not decide his case under *Jackson* at all, but instead resolved the question whether admission of Romero's inaccurate testimony rendered his trial fundamentally unfair and then applied *Jackson* to determine whether that error was harmless.

Although both petitioners and respondent are now aligned on the same side of the questions presented for our review, the case is not moot because "the parties continue to seek different relief" from this Court. *Pacific Bell Telephone Co.* v. *linkLine Communications, Inc.*, 555 U. S. ___, ___ (2009) (slip op., at 6). Respondent primarily argues that we affirm on his proposed alternative ground or remand to the Ninth Circuit for analysis of his due process claim under the standard for harmless error of *Brecht* v. *Abrahamson*, 507 U. S. 619 (1993). The State, on the other hand, asks us to reverse. Respondent and one *amicus* have also suggested that we dismiss the case as improvidently granted, Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 27–28, but we think prudential concerns favor our review of the Court

Per Curiam

of Appeals' application of *Jackson*. Cf. *Pacific Bell*, *supra*, at \_\_\_ (slip op., at 7).

Respondent no longer argues it was proper for the District Court to admit the Mueller Report for the purpose of evaluating his *Jackson* claim, Brief for Respondent 35, and concedes the "purpose of a *Jackson* analysis is to determine whether the jury acted in a rational manner in returning a guilty verdict based on the evidence before it, not whether improper evidence violated due process," *id.,* at 2. There has been no suggestion that the evidence adduced at trial was insufficient to convict unless some of it was excluded. Respondent's concession thus disposes of his *Jackson* claim. The concession is also clearly correct. An "appellate court's reversal for insufficiency of the evidence is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal." *Lockhart* v. *Nelson*, 488 U. S. 33, 39 (1988). Because reversal for insufficiency of the evidence is equivalent to a judgment of acquittal, such a reversal bars a retrial. See *Burks* v. *United States*, 437 U. S. 1, 18 (1978). To "make the analogy complete" between a reversal for insufficiency of the evidence and the trial court's granting a judgment of acquittal, *Lockhart*, 488 U. S., at 42, "a reviewing court must consider all of the evidence admitted by the trial court," regardless whether that evidence was admitted erroneously, *id.*, at 41.

Respondent therefore correctly concedes that a reviewing court must consider all of the evidence admitted at trial when considering a *Jackson* claim. Even if we set that concession aside, however, and assume that the Court of Appeals could have considered the Mueller Report in the context of a *Jackson* claim, the court made an egregious error in concluding the Nevada Supreme Court's rejection of respondent's insufficiency-of-the-evidence claim "involved an unreasonable application of . . . clearly

established Federal law," 28 U. S. C. §2254(d)(1).[4]

Even if the Court of Appeals could have considered it, the Mueller Report provided no warrant for entirely excluding the DNA evidence or Romero's testimony from that court's consideration. The Report did not contest that the DNA evidence matched Troy. That DNA evidence remains powerful inculpatory evidence even though the State concedes Romero overstated its probative value by failing to dispel the prosecutor's fallacy. And Mueller's claim that Romero used faulty assumptions and underestimated the probability of a DNA match between brothers indicates that two experts do not agree with one another, not that Romero's estimates were unreliable.[5]

Mueller's opinion that "the chance that among four brothers one or more would match is 1 in 66," App. 1583, is substantially different from Romero's estimate of a 1 in 6,500 chance that one brother would match. But even if Romero's estimate is wrong, our confidence in the jury verdict is not undermined. First, the estimate that is more pertinent to this case is 1 in 132—the probability of a

---

[4] The Court of Appeals also clearly erred in concluding the Nevada Supreme Court's decision was "contrary to" *Jackson*. The Court of Appeals held the Nevada Supreme Court's decision was "contrary to" *Jackson* because the Nevada court stated a standard that turns on a "reasonable" jury, not a "rational" one, and that assesses whether the jury could have been convinced of a defendant's guilt, rather than whether it could have been convinced of each element of the crime. *Brown* v. *Farwell,* 525 F. 3d 787, 794–795 (CA9 2008). It is of little moment that the Nevada Supreme Court analyzed whether a "reasonable" jury could be convinced of guilt beyond a reasonable doubt, rather than asking whether a "rational" one could be convinced of each element of guilt; a *reasonable* jury could hardly be convinced of guilt unless it found each element satisfied beyond a reasonable doubt.

[5] The State has called our attention to cases in which courts have criticized opinions rendered by Professor Mueller in the past. See Brief for Petitioners 53–54. We need not pass on the relative credibility of the two experts because even assuming that Mueller's estimate is correct, respondent's claim fails.

match among two brothers—because two of Troy's four
brothers lived in Utah. Second, although Jane Doe men-
tioned Trent as her assailant, and Travis lived in a nearby
trailer, the evidence indicates that both (unlike Troy) were
sober and went to bed early on the night of the crime.
Even under Mueller's odds, a rational jury could consider
the DNA evidence to be powerful evidence of guilt.

Furthermore, the Court of Appeals' discussion of the
non-DNA evidence departed from the deferential review
that *Jackson* and §2254(d)(1) demand. A federal habeas
court can only set aside a state-court decision as "an un-
reasonable application of . . . clearly established Federal
law," §2254(d)(1), if the state court's application of that
law is "objectively unreasonable," *Williams* v. *Taylor*, 529
U. S. 362, 409 (2000). And *Jackson* requires a reviewing
court to review the evidence "in the light most favorable to
the prosecution." 443 U. S., at 319. Expressed more fully,
this means a reviewing court "faced with a record of his-
torical facts that supports conflicting inferences must
presume—even if it does not affirmatively appear in the
record—that the trier of fact resolved any such conflicts in
favor of the prosecution, and must defer to that resolu-
tion." *Id.*, at 326; see also *Schlup* v. *Delo*, 513 U. S. 298,
330 (1995) ("The *Jackson* standard . . . looks to whether
there is sufficient evidence which, if credited, could sup-
port the conviction"). The Court of Appeals acknowledged
that it must review the evidence in the light most favor-
able to the prosecution, but the court's recitation of incon-
sistencies in the testimony shows it failed to do that.

For example, the court highlights conflicting testimony
regarding when Troy left the Peacock. 525 F. 3d, at 797.
It is true that if a juror were to accept the testimony of one
bartender that Troy left the bar at 1:30 a.m., then Troy
would have left the bar after the attack occurred. Yet the
jury could have credited a different bartender's testimony
that Troy left the Peacock at around 12:15 a.m. Resolving

the conflict in favor of the prosecution, the jury must have found that Troy left the bar in time to be the assailant. It is undisputed that Troy washed his clothes immediately upon returning home. The court notes this is "plausibly consistent with him being the assailant" but also that he provided an alternative reason for washing his clothes. *Ibid.* Viewed in the light most favorable to the prosecution, the evidence supports an inference that Troy washed the clothes immediately to clean blood from them.

To be sure, the court's *Jackson* analysis relied substantially upon a concession made by the State in state post-conviction proceedings that "absent the DNA findings, there was insufficient evidence to convict [Troy] of the crime." App. 1180. But that concession posited a situation in which there was no DNA evidence at all,[6] not a situation in which some pieces of testimony regarding the DNA evidence were called into question. In sum, the Court of Appeals' analysis failed to preserve "the factfinder's role as weigher of the evidence" by reviewing "*all of the evidence* . . . in the light most favorable to the prosecution," *Jackson*, *supra*, at 319, and it further erred in finding that the Nevada Supreme Court's resolution of the *Jackson* claim was objectively unreasonable.

IV

Resolution of the *Jackson* claim does not end our consideration of this case because respondent asks us to affirm on an alternative ground. He contends the two errors "in describing the statistical meaning" of the DNA evidence rendered his trial fundamentally unfair and denied him

---

[6] The concession was made in the context of proceedings in which respondent argued that competent counsel would have objected to the admissibility of the DNA evidence on a number of grounds—including Romero's qualifications, chain-of-custody problems, and failure to follow the proper testing protocol—and might have successfully excluded the DNA evidence altogether. See App. 1099–1100.

due process of law. Brief for Respondent 4. Because the Ninth Circuit held that "the admission of Romero's unreliable and misleading testimony violated [respondent's] due process rights," 525 F. 3d, at 797, and in respondent's view merely applied *Jackson* (erroneously) to determine whether that error was harmless, he asks us to affirm the judgment below on the basis of what he calls his "DNA due process" claim, Brief for Respondent 35.

As respondent acknowledges, in order to prevail on this claim, he would have to show that the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U. S. C. §2254(d)(1). The clearly established law he points us to is *Manson* v. *Brathwaite*, 432 U. S. 98, 114 (1977), in which we held that when the police have used a suggestive eyewitness identification procedure, "reliability is the linchpin in determining" whether an eyewitness identification may be admissible, with reliability determined according to factors set out in *Neil* v. *Biggers*, 409 U. S. 188 (1972). Respondent argues that the admission of the inaccurate DNA testimony violated *Brathwaite* because the testimony was "identification testimony," 432 U. S., at 114, was "unnecessarily suggestive," *id.*, at 113, and was unreliable.

Respondent has forfeited this claim, which he makes for the very first time in his brief on the merits in this Court. Respondent did not present his new "DNA due process" claim in his federal habeas petition, but instead consistently argued that Romero's testimony should be excluded from the *Jackson* analysis simply because it was "unreliable" and that the due process violation occurred because the remaining evidence was insufficient to convict. See App. to Pet. for Cert. 157a ("[Respondent] asserts . . . that the DNA evidence was unreliable and should not have been admitted at his trial. If so, then, . . . the state presented insufficient evidence at trial to prove [respondent]

guilty"). In the Ninth Circuit, too, respondent presented only his *Jackson* claim,[7] and it is, at the least, unclear whether respondent presented his newly minted due process claim in the state courts.[8] Recognizing that his *Jackson* claim cannot prevail, respondent tries to rewrite his federal habeas petition. His attempt comes too late, however, and he cannot now start over.

\*     \*     \*

We have stated before that "DNA testing can provide powerful new evidence unlike anything known before." *District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 8). Given the persuasiveness of such evidence in the eyes of the jury, it is important that it be presented in a fair and reliable manner. The State acknowledges that Romero committed the prosecutor's fallacy, Brief for Petitioners 54, and the Mueller Report suggests that Romero's testimony may have been inaccurate regarding the likelihood of a match with one of respondent's brothers. Regardless, ample

---

[7] The Court of Appeals did reason that Romero's testimony must be excluded from the *Jackson* analysis on due process grounds. 525 F. 3d, at 797. But that decision was inextricably intertwined with the claim respondent did make in his federal habeas petition under *Jackson*. It is clear the Ninth Circuit was never asked to consider—and did not pass upon—the question whether the Nevada Supreme Court entered a decision on direct appeal that was contrary to or an unreasonable application of *Manson* v. *Brathwaite,* 432 U. S. 98 (1977), or any other clearly established law regarding due process other than *Jackson*.

[8] The State contends the claim is either not exhausted or procedurally defaulted. The State has objected from the beginning that respondent did not raise a due process claim regarding the reliability of the DNA evidence in state court. See App. to Pet. for Cert. 182a–183a. Respondent consistently answered the State's exhaustion objection by arguing he presented his *Jackson* claim in the Nevada Supreme Court. See App. 1521–1526. The Ninth Circuit held respondent exhausted his *insufficiency* claim. 525 F. 3d, at 793. The court had no occasion to consider whether respondent exhausted any due process claim other than his *Jackson* claim.

Per Curiam

DNA and non-DNA evidence in the record adduced at trial supported the jury's guilty verdict under *Jackson*, and we reject respondent's last minute attempt to recast his claim under *Brathwaite*. The Court of Appeals did not consider, however, the ineffective-assistance claims on which the District Court also granted respondent habeas relief. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–559

_____

## E. K. McDANIEL, WARDEN, ET AL., PETITIONERS *v.* TROY BROWN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 11, 2010]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring.

I join the *per curiam* because it correctly holds that the Ninth Circuit erred in departing from *Jackson'*s mandate that a federal habeas court confine its sufficiency-of-the-evidence analysis to "the evidence adduced at trial" and, specifically, to "'all of the evidence admitted by the trial court.'" *Ante*, at 11 (quoting *Lockhart* v. *Nelson*, 488 U. S. 33, 41 (1988)); see *Jackson* v. *Virginia*, 443 U. S. 307 (1979). I write separately because I disagree with the Court's decision to complicate its analysis with an extensive discussion of the Mueller Report. See *ante*, at 7–13. Defense counsel commissioned that report 11 years after respondent's trial. See *ante*, at 1. Accordingly, the report's attacks on the State's DNA testimony were not part of the trial evidence and have no place in the *Jackson* inquiry. See *Jackson*, *supra*, at 318; *Lockhart*, *supra*, at 40–42. That is all we need or should say about the report in deciding this case.

The Court's opinion demonstrates as much. The Court's lengthy discussion of the Mueller Report, see *ante*, at 7–10, is merely a predicate to asserting that "even if" the Court of Appeals could have considered the report in its *Jackson* analysis, the report "provided no warrant for entirely excluding the DNA evidence or Romero's testi-

mony from that court's consideration" because the report "did not contest that the DNA evidence matched Troy" or otherwise show that the State's DNA estimates were "unreliable," *ante,* at 12. Based on these observations, the Court concludes that the Mueller Report did not undermine the State's DNA tests as "powerful inculpatory evidence." *Ibid.* That is true, but even if the report had completely undermined the DNA evidence—which the Ninth Circuit may have mistakenly believed it did, see *Brown* v. *Farwell*, 525 F. 3d 787, 795–796 (2008)—the panel still would have erred in considering the report to resolve respondent's *Jackson* claim. The reason, as the Court reaffirms, is that *Jackson* claims must be decided solely on the evidence adduced at trial. See *ante*, at 11. Accordingly, the Court need not correct any erroneous impressions the Ninth Circuit may have had concerning the report's impact on the State's DNA evidence to resolve respondent's *Jackson* claim.\* Because that is the only claim properly before us, I do not join the Court's dicta about how the Mueller Report's findings could affect a constitutional analysis to which we have long held such post-trial evidence does not apply. See *Jackson, supra,* at 318.

_____

\*Correcting the Ninth Circuit's apparent misconception of the effects of the Mueller Report is the only plausible reason for the Court's decision to explain that the report would not have undermined the State's DNA results "even if" the Court of Appeals could have considered it in resolving respondent's *Jackson* claim. *Ante,* at 11–12. That discussion cannot properly be read to suggest either that there are circumstances in which post-trial evidence would "warrant" excluding DNA trial evidence from a *Jackson* analysis, *ante,* at 12, or that courts applying *Jackson* may consider post-trial evidence for any other purpose. Both points are squarely foreclosed by the precedents on which the Court relies in reversing the Ninth Circuit's judgment. See *ante*, at 1 (citing *Jackson*, v. *Virginia,* 443 U. S. 307, 324 (1979)); *ante,* at 11 (citing *Lockhart*, v. *Nelson,* 488 U. S. 33, 39 (1988)), respectively.