NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

12-326

STATE OF LOUISIANA

VERSUS

KEVIN FRANCIS

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 74,764
HONORABLE EDWARD D. RUBIN, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

JOHN D. SAUNDERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Elizabeth A. Pickett, and James T. Genovese, Judges.

AFFIRMED.

Michael Harson
District Attorney, 15th JDC
P.O. Box 3306
Lafayette, LA 70502-3306
(337) 232-5170
COUNSEL FOR APPELLEE:
    State of Louisiana

**Edward John Marquet**
**Attorney at Law**
**Post Office Box 53733**
**Lafayette, LA 70505-3733**
**(337) 237-6841**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Kevin Francis**

**Roger P. Hamilton, Jr.**
**Acadia Parish, ADA**
**P. O. Box 288**
**Crowley, LA 70527**
**(337) 788-8831**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**SAUNDERS, Judge.**

Defendant, Kevin Francis, was convicted of first degree murder, a violation of La.R.S. 14:30; attempted first degree murder, violations of La.R.S. 14:27 and 14:30; and forcible rape, a violation of La.R.S. 14:42.1, at a bench trial on September 19–20, 2011. He was sentenced to life in prison without benefit of parole, probation, or suspension of sentence for the murder conviction; fifty years at hard labor without benefit of parole, probation, or suspension of sentence on the attempted murder conviction; and forty years at hard labor without benefit of parole, probation, or suspension of sentence on the rape conviction. All sentences are to run concurrently. Defendant appeals his conviction, alleging the trial court violated his constitutional rights under the Confrontation Clause and erred by not ordering the production of an out-of-court statement of one of the victims.

## FACTS:

In the early morning hours of April 1, 2009, Linda Bonin was raped with a sex device and murdered at her residence on West Fourteenth Street in Crowley. Ryan Snow was beaten with a pistol and shot in the arm, and shots were fired at him when he fled the scene.

Snow testified at trial he "barely" recalled the day of the incident. He had been staying at "Laurie's house" on West Fourteenth Street for "about a week or two." Ms. Bonin (Laurie's aunt) and her five-year-old daughter also stayed there. Around 12:45 to 1:00 a.m., Ms. Bonin was in bed, and Snow heard voices coming from the utility room which was connected to the kitchen by a door. "The door [to the kitchen] flew open," and "[s]omebody kicked it in." Snow saw three people come into the residence. He ran to Ms. Bonin's bedroom to wake her and look for "something to defend [them]selves because [he] figured something bad was about to happen."

After Snow closed and locked the door to Ms. Bonin's bedroom, the intruders kicked in that door. They told Snow to empty his pockets; "[t]hey were looking for money." "One of the boys" pistol-whipped Snow in the head and knocked him to the ground. "One of the boys" also gave Snow a cell phone and told him to call "C," Laurie's boyfriend, to come to the house but not tell him who was there. "C" "didn't respond really." The three intruders took Snow and Ms. Bonin to the front room and tied them up. Each of the men had a pistol; one of them hit Snow again. They made Snow and Ms. Bonin lie down facing the ground, and they tied them with "[s]ome sort of cord, with Snow's hands behind his back.

The trio "started throwing eggs and Ranch [salad dressing] and stuff" all over Snow and Ms. Bonin. They told them "to shut up, don't look at them, [and] keep [their] faces down to the ground." Ms. Bonin "kept screaming, kept trying to argue with them, trying to reason with them." All three "[were] going on about the money," asking where it was.

At some point, Claude Morrison, Jr. shot Snow in the arm. Snow "could see kind of a glimpse behind me (referring to himself) from the corner of my vision like that," and he saw Morrison, wearing a black shirt. Snow "played dead," but he had his eyes open. One of them then "raped [Ms. Bonin] with something." Snow "heard blood-curdling screams" during and after the rape. He did not see who raped her. Snow saw Defendant out of the corner of his left eye "pull the trigger and shoot [Ms. Bonin] in the head." He recognized Defendant's voice when he heard Defendant tell Ms. Bonin "to shut up twice, and then he pulled the trigger." The intruders left the house; Snow ran out the front door and across the street. One of the intruders saw him and shot three more rounds.

2

Snow identified Morrison, Ryan Williams, and Defendant from photo lineups, and he identified Defendant at trial as the person who shot Ms. Bonin. He had seen Defendant during the previous weekend. Snow and Defendant had gone to school together and "were friends for a while." Prior to the shooting, Snow heard someone call Defendant's name. Defendant denied knowing Snow and going to school with him.

Later in the morning of the shooting, Snow gave two statements to the police. At trial, he recalled making only one video statement. He testified he could not remember everything from the incident two years before, but he stated, "I do remember being shot by Claude Morrison, Jr., and I do remember watching [Defendant] shoot Linda Bonin in the head."

When Snow gave his statement, he said he "didn't see no faces" [sic] but only heard names being called. At trial, he said "at that time, I was protecting myself and my family. I did not want to rat. I did not want to speak the names at first." Although "they kept trying to get [him] to talk," Snow would not identify the young men and was lying in his statements when he said he could not see the three faces. He was "lying [his] ass off . . . because [he] was trying to protect [himself] and [his] mother." Snow also never identified Defendant as the shooter in his statements. He realized he needed to tell the truth "[w]hen [his] momma started talking to [him,] making [him] realize that them boys do [sic] need to be punished for what they did." "[I]t took her about three or four days to get [Snow] to come clean."

Snow also testified that he lied when he first said in his statement that he saw them insert a sex device into Ms. Bonin's rectum and rape her with it. He actually did not see anything regarding the rape. Later in the same statement, he said he "heard them say 'stick her with the dildo,'" and that was the only way he

knew about the rape. Snow testified at trial, "[W]hen they left the house[, he] saw [Ms. Bonin] with her drawers and her pants and her panties pulled down." Defendant was standing next to Ms. Bonin at the time of the shooting.

The trial court accepted Dr. Terry Welke as an expert in forensic pathology. Dr. Welke testified Ms. Bonin died from a gunshot wound to the head. His autopsy revealed discolorations of the anus "consistent with some sort of penetration that occurred prior to or just near the time of death."

Lieutenant Jimmy Broussard of the Crowley Police Department investigated the incident. He interviewed Williams, who said Morrison shot Snow, and he thought Defendant shot Ms. Bonin. Lieutenant Broussard was aware of only one statement given by Snow, the first one beginning at 5:04 a.m. on April 1, 2009. He testified Snow never told him he was concerned about his safety.

On April 8, 2009, Lieutenant Broussard interviewed Ove Wilson, who said Morrison had told him he had killed someone. Morrison also told Wilson Defendant and Williams had killed someone. Lieutenant Broussard pursued all three as persons of interest based on that information. Attempts were made to collect gunpowder residue from the suspects, but Lieutenant Broussard did not know the name of the crime lab to which the material was sent.

Ryan Williams also testified at trial. He pled guilty to attempted armed robbery in connection with this incident and was sentenced to twelve years in prison in exchange for his agreement to testify truthfully in this matter. Williams testified he, Morrison, and Defendant entered the house with guns through an open door to commit a robbery. Morrison and Defendant tied up Snow and Ms. Bonin and "[s]tart[ed] searching the place." While the other two stayed with Snow and Ms. Bonin, Williams searched the house for about forty-five minutes. They had Snow call "C" on the phone "[t]o make him come back," but he did not. Williams

4

testified Defendant shot Ms. Bonin, and Morrison shot Snow. At trial, he would not initially answer the question of who raped Ms. Bonin; however, he gave a statement on December 11, 2009, in which he said Defendant committed the rape. Williams then testified he saw Defendant "[s]t[i]ck a dildo up" Ms. Bonin one time. Williams testified Snow could not see Ms. Bonin, Defendant, or Morrison from his position on the floor.

The three men left the house but returned to get Defendant's cell phone. They saw Snow running to someone's house, and Defendant and Morrison shot at him three or four times. Williams did not recall saying in a statement on April 1, 2009, that he thought Defendant shot Ms. Bonin. When defense counsel requested Williams read excerpts from his statements, he refused. Defense counsel pointed out Williams' statement said Morrison raped Ms. Bonin; when he asked Williams which was the truth, Williams responded, "Don't matter. Whatever one y'all want to believe." Finally, this exchange occurred:

[DEFENSE COUNSEL]:

Q. All right. Mr. Williams, we've got a whole bunch of more questions I want to ask you, so just be patient, I'm almost done.

Now, are you going to proceed with cooperating and answer my questions at this point, sir?

THE WITNESS:

A. No, sir.

Q. You're going to refuse to respond to any of my questions at this point?

A. Yes, sir.

Defense counsel asked the trial court to strike "everything from the record in which he's accusing my client of doing." The trial court denied the request, released

Williams, and denied the admission of his December 11, 2009 sworn statement into evidence. It did allow the April 1, 2009 statement to be admitted.

Morrison invoked his Fifth Amendment rights and refused to testify at trial. Therefore, the court allowed the introduction of the sworn statement he made on October 1, 2010. Morrison stated the three men went to the house looking for a stash of drugs. Morrison hit Snow twice with his gun, and Williams and Defendant tied up Snow. They searched the house and threw food on Snow and Ms. Bonin. Morrison said Williams found the sex device in a bedroom, and Williams "pulled her pants down and he entered the dildo in her." Morrison became nervous, pulled the trigger of his gun, and shot Snow. He thought Snow was dead, and he left the room. He was out of the room when he heard another gunshot; Williams and Defendant were coming out of the room, but they would not tell him what happened. Morrison did not know who shot Ms. Bonin.

Further, according to Defendant, they left the house but returned for the cell phone. They thought they saw Snow. Williams reached for his gun, but Defendant said it was not Snow. They arrived at the house, "[t]hen [Williams] disappeared," and Morrison heard two gunshots outside.

Defendant took the stand as the final witness at trial. He was positive Williams, not Morrison, shot Snow. Williams "pulled down [Ms. Bonin's] pants and hit her with the sex toy after she was bound. He had nothing to do with that. Morrison shot Ms. Bonin. Defendant had nothing to do with that either; he was "just in the house." Snow was lying on the floor, "[f]aced toward the door," with his eyes closed and not in a position to see Ms. Bonin when Morrison shot her. He and Morrison were in the house looking for his phone when Williams shot at Snow outside. He did not know why Williams or Snow would say he shot Ms. Bonin,

6

and he did not know Snow. They went to the house that night because "Williams said they had money over there."

The court accepted Bethany Harris of the Acadiana Crime Lab as an expert in forensic DNA analysis. She performed DNA testing on gloves found at the scene. On the inside of the right glove, she obtained a mixed DNA profile showing "most likely one major DNA contributor and at least two minor DNA contributors. . . . The profile of the major DNA contributor matched the DNA profile obtained from the reference sample of [Defendant]." She was able to exclude Ms. Bonin, Snow, Williams, and Morrison as contributors of the DNA. The inside of the left glove also showed a "mixed partial DNA profile, consisting of at least two individuals." Ms. Harris "could not exclude [Defendant] as a potential contributor to the mixed profile."

Although Ms. Harris extracted DNA from thirty-three different items, the only other item containing Defendant's DNA was a black t-shirt that also contained a stain of his own blood. Williams's DNA was found on several items, but Morrison's DNA was not.

The trial court found Defendant guilty as charged on all three counts.[1] On September 28, 2011, the trial court sentenced Defendant to life imprisonment

---

[1]Immediately before Morrison testified, this exchange occurred:

[DEFENSE COUNSEL]: Before I do that I want to make a motion for a directed verdict at this point.

THE COURT: Denied.

[DEFENSE COUNSEL]: But Judge –

THE COURT: Denied.

[DEFENSE COUNSEL]: But, Judge, there's three charges. There's three charges. You're denying –

THE COURT: Forcible rape, first degree murder, and what's the other one?

[DEFENSE COUNSEL]: Attempted murder of Ryan Snow.

without benefit of parole, probation, or suspension of sentence on the murder conviction; forty years at hard labor without benefit of probation, parole, or suspension of sentence on the forcible rape conviction; and fifty years at hard labor, without benefit of parole, probation, or suspension of sentence on the attempted murder conviction. All sentences are to run concurrently.

## ASSIGNMENT OF ERROR NO. 1:

Defendant argues the trial court violated his rights of confrontation and "vigorous cross-examination" of an accomplice by denying his motion to strike Williams' testimony when Williams refused to answer defense counsel's questions. Defendant admits this error may be a harmless one.

This court addressed the issue of harmless error in a confrontation setting in *State v. Truehill*, 09-1546 (La.App. 3 Cir. 6/2/10), 38 So.3d 1246.[2] In determining whether a trial court error is harmless, this court should consider these factors: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the

---

THE COURT: All right. I'll grant the motion on the attempted murder of Ryan Snow.

[STATE'S COUNSEL]: Your Honor, the State would just argue that under the principle [sic] statute in the Code of – Title 14, that –

THE COURT: That he acted in concert.

[STATE'S COUNSEL]: Yes, sir.

THE COURT: No. So denied.

[DEFENSE COUNSEL]: Thank you, Your Honor.

[2]The issue in *Truehill* was whether Defendant's counsel was deficient, but this court had to address the merits of the confrontation question to determine the outcome.

8

prosecution's case." *Id.* at 1254 (quoting *State v. Robinson*, 01-273 (La. 5/17/02), 817 So.2d 1131, 1137).

According to Williams' trial testimony, Defendant raped and shot Ms. Bonin and shot at Snow after he fled the house. According to his April 1, 2009 statement, Defendant and Morrison pistol-whipped Ms. Bonin, and Defendant shot her. However, Williams said Morrison raped her. Williams said Morrison fired two shots at Snow as he fled the house. Thus, the testimony common to both accounts is the shooting of Ms. Bonin.

Snow also testified Defendant shot Ms. Bonin, even though in his statement he said he did not see any faces. However, he later explained he said that because he was afraid. Lieutenant Broussard testified Wilson said Morrison told him Defendant had killed someone. Morrison did not know who shot Ms. Bonin, but he said Defendant and Williams were in the room when she was killed.

Summarizing Williams's testimony, he said:

■ Defendant raped Ms. Bonin (trial testimony).

■ Morrison raped Ms. Bonin (April 1, 2009 statement).

■ Morrison shot Snow.

■ Defendant shot Ms. Bonin.

■ Defendant and Morrison shot at Snow three or four times as Snow ran from the scene.

Summarizing the testimony of the other witnesses, each said:

Defendant

■ All three men were armed.

■ Morrison shot Ms. Bonin.

■ Williams raped Ms. Bonin.

■ Williams shot at Snow outside.

9

■ "I didn't commit no crime." (R. p. 462).

Morrison

■ He told Wilson Defendant killed someone.

■ He did not know who shot Ms. Bonin, but Defendant and Williams were in the room.

■ Williams raped Ms. Bonin.

■ He shot Snow and thought he was dead.

■ He did not know where Williams was, but he and Defendant were in the house when gunshots were fired outside.

Snow

■ Each of the three men was armed.

■ Morrison shot Snow.

■ He did not see who raped Ms. Bonin.

■ Defendant shot Ms. Bonin.

■ One of the men shot at him as he ran from the scene.

Lieutenant Broussard

■ Wilson said Morrison told him he had killed someone.

■ Wilson also said Morrison told him Defendant and Williams had killed someone.

Bethany Harris

■ She sould not exclude Defendant as the contributor of DNA on the inside of the left glove, but excluded Ms. Bonin, Snow, Williams, and Morrison .

■ Defendant's DNA was also found only on a black t-shirt.

■ Williams's DNA was found on several items, but Morrison's was not.

Williams's testimony and statement were important to the case simply because he was one of the three perpetrators and an eyewitness to everything that happened. Nevertheless, other evidence from other eyewitnesses also establishes what took place, making Williams' testimony somewhat cumulative. Some of

Williams' testimony corroborated the testimony of other witnesses, and some of it contradicted them. Defendant was able to cross-examine all the other witnesses without limitation. He was also able to accomplish considerable cross-examination of Williams before Williams refused to talk further.

The factfinder's role is to weigh the credibility of witnesses. *State v. Ryan*, 07-504 (La.App. 3 Cir. 11/7/07), 969 So.2d 1268. Thus, other than insuring the sufficiency evaluation standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), "the appellate court should not second-guess the credibility determination of the trier of fact," but rather, it should defer to the rational credibility and evidentiary determinations of the jury. *Ryan*, 969 So.2d at 1270 (quoting *State v. Lambert*, 97-64, pp. 4-5 (La.App. 3 Cir. 9/30/98), 720 So.2d 724, 726-27). Our supreme court has stated:

> However, an appellate court may impinge on the fact finder's discretion and its role in determining the credibility of witnesses "only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La.1988). In determining the sufficiency of the evidence supporting a conviction, an appellate court must preserve " 'the factfinder⬜s role as weigher of the evidence' by reviewing 'all of the evidence . . . in the light most favorable to the prosecution.'" *McDaniel v. Brown,* 558 U.S. [120], ___ [2010], 130 S.Ct. 665, 674, 175 L.Ed.2d 582 (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

*State v. Strother*, 09-2357, p. 10 (La. 10/22/10), 49 So.3d 372, 378.

One who is "concerned in the commission of a crime, whether he directly committed the act constituting the offense, aided and abetted in its commission, or directly or indirectly counseled or procured another to commit the crime" may be convicted as a principal to the crime. La.R.S. 14:24. The evidence shows that the trial judge could reasonably find that Defendant's involvement in Ms. Bonin's rape and murder and Snow's attempted murder were sufficient to cast him as a principal to both crimes. Thus, any error that may have occurred regarding Williams's

11

testimony or any violation of his right to confront and cross-examine witnesses was harmless. This assignment of error lacks merit.

## ASSIGNMENT OF ERROR NO. 2:

Snow testified he met with the State's attorney "to get [his] story straight with them and everybody." He did not recall the date of that meeting. He first said he believed he gave a recorded statement at that time, but then said he did not. When Defendant's counsel heard this testimony, he requested an instanter subpoena for the recorded statement. In the event the statement was not recorded, Defendant's counsel requested an instanter subpoena for another Assistant District Attorney, Angie Wagar. He also asked for the State's counsel to be placed on the witness stand. The trial court denied all the requests over objection.

Snow's testimony later in the trial gave rise to confusion. Defense counsel questioned Snow about the two statements he gave police on April 1, 2009. Snow testified he only recalled making one statement on that date. Defense counsel questioned Snow further:

Q.    Other than this second statement, did you make any other written statements to the police?

A.    Not to my knowledge.

Q.    You mentioned earlier somebody videoing?

A.    A video recorded statement, that's it. Not video tape but like record. Voice recorded.

Q.    Oh, you're talking about –

A.    Voice recorded. That's what I mean. Yes, sir. Audio.

Q.    Not with the camera?

A.    No. Not with the camera. No, sir.

Q.    Okay. So you only made two statements?

A.    Yes, sir. To my knowledge.

12

After Snow's re-direct testimony, defense counsel requested further questioning of Snow:

> Judge, he brought out something new that – about this statement that he made to [the State's attorney]. I asked him on cross whether or not he made any other statements. He said he only made two. And then [the State's attorney] asked him about another statement. He said he made a statement to [the State's attorney]. So I need to ask him about that, when did he do that.

The trial court responded, "[o]verruled" and noted Defendant's objection. Defense counsel then again requested an instanter subpoena for the statement "[s]ince [Snow] claimed that he made a third statement to [the State's attorney]." The trial court and the State's attorney both responded, "I didn't hear that."

We find that both groups of testimony quoted above refer to the same statement Snow alleges he gave to the State's attorney and Ms. Wagar on an unrecalled date. Therefore, the issue is whether the trial court erred in failing to require the State to produce this statement recalled by Snow.

The record implies the meeting was not recorded. After Snow testified he met with the State's attorney and Ms. Wagar, an unrecorded sidebar conference occurred. The next entry in the record shows Defendant's counsel stated, "[w]ell, if those statements were not recorded," and his request to question the State's attorney and Ms. Wagar was denied.

The State's brief indicates counsel "interviewed the victim Ryan Snow to determine the facts of the case," as it is allowed to do pursuant to La.R.S. 46:1844(C). The State further indicates it "is not in possession of any statement taken of Ryan Snow besides the statement taken by Crowley Police Department and the Deposition. Both of these statements were given to the defendant and his counsel when requested through the discovery process."

13

We find that Defendant has shown nothing to suggest the State has been untruthful. Snow was mistaken before about the statements he gave. He testified he gave only one statement to the Crowley Police Department, when two separate statements, taken on the same date but at different times, were introduced into evidence. Without evidence of any wrongdoing by the State's attorneys, Snow was simply mistaken when he said he gave a recorded statement when he met with the State's attorneys.

**<u>DECREE</u>:**

Defendant's convictions and sentences are affirmed.

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules–Courts of Appeal, Rule 2–16.3.