An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-701

NORTH CAROLINA COURT OF APPEALS

Filed: 4 February 2014

STATE OF NORTH CAROLINA

    v.

ZACHARY LEE OAKS

Cumberland County
Nos. 09 CRS 56531-32

Appeal by Defendant from judgments entered 29 November 2012 by Judge James F. Ammons Jr. in Cumberland County Superior Court. Heard in the Court of Appeals 11 December 2013.

> *Attorney General Roy Cooper, by Assistant Attorney General Jess D. Mekeel, for the State.*

> *Unti & Lumsden LLP, by Sharon L. Smith, for Defendant.*

STEPHENS, Judge.

## *Background*

This case arises from the death of James "Jimmy" Ali McCullen[1] ("the decedent") and the stabbing of Linda Paige.

---

[1] There is some discrepancy regarding the decedent's last name. The State refers to him as Jimmy McCullough, and he is listed as such in the warrant for Defendant's arrest. However, the transcript and Defendant's brief exclusively refer to him as Jimmy McCullen. Relying on the transcript as authoritative, we employ that spelling here.

Around 9:00 p.m. on 14 April 2009, the decedent was seen walking outside the Club Spectrum, near Bragg Boulevard in Fayetteville, dressed in drag. The decedent was working as a prostitute. Later that night, the decedent was found lying in a pool of blood with five stab wounds. A gray shirt and footprints indicating a struggle were discovered nearby. No one at the scene knew the identity of the perpetrator.

A few weeks later, on 8 May 2009, Defendant hired a female prostitute, Linda Paige, to perform oral sex. This occurred behind a vacant house near Mickey's, a nightclub. Once Paige finished, Defendant "snapped" and attacked her, stabbing her several times. While Paige was helpless, Defendant took back his payment and left the scene of the attack. According to Defendant, people then started to chase him, and he ran to Mickey's. There he approached the bouncer, Nathaniel Butler, and claimed that he was being chased by someone who was trying to kill him. Butler put Defendant in a cab and told him to leave. When Butler learned that police were coming, however, he removed Defendant from the cab. Butler then frisked Defendant and found a large knife in his sock.

Paramedics and police arrived at the scene of the stabbing. They discovered Paige on the ground, "hurting and kind of crying

[hysterically]," and Officer Alexander Herrera was informed that the perpetrator had gone to Mickey's. Paige was taken to the hospital and released later that night. She did not testify at trial. Herrera proceeded to the nightclub and asked the crowd standing outside "who stabbed the lady across the street." Defendant stood up and responded, "I stabbed her." Defendant was then taken into custody, and one of the bouncers gave the knife to Herrera.

Defendant was questioned on 9 May 2009. During the interrogation, Defendant agreed to speak to the investigators and waived his right to an attorney. Defendant then admitted to murdering the decedent and stabbing Paige. He explained that he had previously solicited a prostitute for oral sex without realizing that the person was biologically male. When he discovered this fact, Defendant became angry and wanted revenge. According to Defendant, the desire for revenge against male prostitutes became so strong that he "went up [Bragg Boulevard] and I got the first one I saw," *i.e.*, the decedent. Defendant admitted that he wanted the decedent to die and stabbed the decedent multiple times "[a]ll over his body[,] all over his body. I wanted to make sure he was dead." Defendant also referenced voices in his head, suicidal thoughts, and the

feeling that there were demons inside him trying to escape.

Defendant was charged with assault with a deadly weapon with intent to kill inflicting serious injury and first-degree murder. Those charges were joined for trial.[2] On 7 February 2011, Defendant's attorney filed a motion for a competency evaluation. No further documentation regarding the request for such an evaluation exists in the record on appeal, and Defendant's appellate counsel states that she "was unable to locate either a transcript of a pre-trial hearing regarding [Defendant's] capacity to proceed or a written order by the trial court finding him capable of proceeding to trial."

The trial began on 26 November 2012 in Cumberland County Superior Court. During the trial, a laboratory analyst for the State Bureau of Investigation ("SBI") testified regarding the deoxyribonucleic acid ("DNA") test results from the blood on the decedent's clothes and the gray shirt found at the scene. The blood from the shirt was consistent with the decedent's DNA, and samples obtained from under the armpits and neck were consistent with Defendant's DNA. Additionally, the videotape of the interrogation of Defendant was shown to the jury, and the

---

[2] The record contains a copy of the motion and order for joinder, but lacks a transcript of the hearing on that motion.

transcript was admitted into evidence. After the evidence was presented, the jury found Defendant guilty of first-degree murder and assault with a deadly weapon inflicting serious injury. Defendant was sentenced to life imprisonment without parole for the murder and 25 to 39 months for the assault. Defendant appeals.

*Discussion*

On appeal, counsel for Defendant states her opinion that there are no meritorious issues for appellate review in this case and files her brief pursuant to the procedure established in *Anders v. California*, 386 U.S. 738, 18 L. Ed. 2d 493 (1967) and *State v. Kinch*, 314 N.C. 99, 331 S.E.2d 665 (1985). Accordingly, counsel requests that this Court conduct an independent examination of the record for any possible error and properly appends a letter informing Defendant that she was unable to identify any meritorious arguments on appeal. Counsel also properly informed Defendant that he has the right to submit his own written arguments in support of his appeal and provided him with the necessary contact information to "request additional time to prepare and submit [his] argument." Counsel included a copy of her brief and the record on appeal with her letter to Defendant. She also indicated that she would provide a

copy of the trial transcript if Defendant elected to file a brief with this Court. This comports with the requirements set forth in *Anders* and *Kinch*. *See Kinch*, 314 N.C. at 101-02, 331 S.E.2d at 667.

Defendant has failed to file any arguments with this Court. Though counsel for Defendant believes there are no meritorious arguments on appeal, she has directed our attention to two possible issues: (1) whether the trial court abused its discretion in allowing the State's motion for joinder and (2) whether the trial court erred in admitting the testimony of the SBI analyst. After reviewing those issues and the entire record on appeal, we find no error.

*I. Joinder of Charges Against Defendant*

The first possible issue suggested by defense counsel is "[w]hether the trial court abused its discretion in joining the two charges for trial, as joinder [may have] prejudiced Mr. Oaks'[s] right to a fair trial." We conclude that it did not.

"The motion to join is within the sound discretion of the trial judge, and the trial judge's ruling will not be disturbed absent an abuse of discretion." *State v. Simmons*, 167 N.C. App. 512, 516, 606 S.E.2d 133, 136 (2004), *appeal dismissed and disc. review denied*, 359 N.C. 325, 611 S.E.2d 845 (2005). "Abuse of

discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

> Two or more offenses may properly be joined for trial if the offenses are "based on the same act or transaction or on a *series of acts or transactions connected together* or constituting parts of a single scheme or plan." N.C. Gen. Stat. § 15A-926(a) (2003) . . . . This Court has held that in ruling upon a motion for joinder, a trial judge must utilize a two-step analysis: (1) a determination of whether the offenses have a transactional connection and (2) if there is a connection, a consideration of whether the accused can receive a fair hearing on the consolidated offenses at trial.

*Simmons*, 167 N.C. App. at 516, 606 S.E.2d at 136 (certain citations omitted; emphasis in original). Joinder is generally favored on public policy grounds because it "expedites the administration of justice, reduces the congestion of trial dockets, conserves judicial time, lessens the burden upon citizens who must sacrifice both time and money to serve on juries[,] and avoids the necessity of recalling witnesses who would otherwise be called upon to testify only once." *State v. Maness*, 321 N.C. 454, 458, 364 S.E.2d 349, 351 (1988).

As the State notes in its brief, the offenses in this case were clearly connected by a series of acts as contemplated by section 15A-926(a):

> (1) [B]oth victims were prostitutes; (2) the stabbings were committed in a span of mere weeks and in roughly the same geographical location; (3) the victims were stabbed multiple times . . . ; and (4) [D]efendant's apprehension for and confession to the second stabbing led directly to his confession to the first stabbing.

We agree and, therefore, conclude that joining these offenses did not deprive defendant of a fair trial. Accordingly, we hold that the trial court did not abuse its discretion in allowing the State's motion for joinder.

*II. The Testimony of the SBI Analyst*

The second possible issue suggested by defense counsel is whether the trial court erred in admitting the testimony of the SBI analyst to show random match probability, where such testimony may have relied on the "prosecutor's fallacy" as discussed in *State v. Ragland*, __ N.C. App. __, 739 S.E.2d 616 (2013). We conclude that the trial court did not err in allowing the analyst's testimony.

The North Carolina Supreme Court "has elected to review unpreserved issues for plain error when they involve either (1) errors in the judge's instructions to the jury, or (2) rulings

on the admissibility of evidence." *State v.* Gregory, 342 N.C. 580, 584, 467 S.E.2d 28, 31 (1996). The testimony of the SBI analyst was admitted at trial without objection and, thus, is reviewed for plain error. Plain error arises when the alleged error is "so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citation and internal quotation marks omitted). "Under the plain error rule, [the] defendant must convince [the appellate court] not only that there was error, but that absent the error, the jury probably would have reached a different result." *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993) (citation omitted).

According to the United States Supreme Court,

> [t]he prosecutor's fallacy is *the assumption* that the random match probability is *the same* as the probability that the defendant was not the source of the DNA sample. In other words, if a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy. It is further error to equate source probability with probability of guilt, unless there is no explanation other than guilt for a person to be the source of crime-scene DNA. This faulty reasoning may

> result in an erroneous statement that, based on a random match probability of 1 in 10,000, there is a .01% chance the defendant is innocent or a 99.99% chance the defendant is guilty.

*McDaniel v. Brown*, 558 U.S. 120, 128, 175 L. Ed. 2d 582, 588 (2010) (citation omitted; emphasis added). The critical element of the prosecutor's fallacy is not the existence of testimony about random match probability. Rather, it is the act of assuming that such evidence also constitutes source probability or — at the very least — the failure to correct such an assumption.

> In *McDaniel*, the defendant did not challenge the State's expert's random match probability opinion that only 1 in 3,000,000 people would have the same DNA profile as the rapist. However, the Court explained that the State's expert *failed to properly dispel the prosecutor's fallacy* when the prosecutor asked the State's expert, in a classic example of erroneously equating source probability with random match probability, whether "it would be fair to say that . . . the likelihood that [the DNA was] not the defendant['s] would be .000033," and the State's expert ultimately agreed that it was not inaccurate to state it that way.

*State v. Ragland*, __ N.C. App. __, __, 739 S.E.2d 616, 624 (2013) (brackets, ellipses, and certain internal quotation marks omitted; emphasis added) (citing *McDaniel*, 558 U.S. at 128–29, 175 L. Ed. 2d at 588). Similarly, in *Ragland*, we held that an

investigator "properly testified" at trial when he stated that "the probability of randomly selecting an unrelated individual with the DNA profile that matches the DNA profile obtained [in this case] is greater than 1 trillion, which is more than the world's population for North Carolina Caucasian, Black, Lumbee Indian[,] and Hispanic populations." *Id.* at __, 739 S.E.2d at 625. It was only when the analyst expanded on his testimony by concluding that the random match probability meant, "if it's over the world's population, . . . that there could be no one else other than [the defendant] in the world" and opined that the DNA evidence in that case could "be no one other than [the defendant]" that he engaged in the logical fallacy. *Id.*

Like the investigator in *Ragland*, the SBI analyst in this case testified that, as to both the decedent and Defendant, the "probability of randomly selecting an unrelated individual with a DNA profile that matches the DNA profile obtained from the cutting of the shirt [(*i.e.,* random match probability)] . . . is one in greater than one trillion which is more than the world's population in the North Carolina Caucasian, [B]lack, Lumbee, Indian[,] and Hispanic populations." Following that statement, the analyst explained that it is "*scientifically unreasonable*" to believe that the DNA obtained from the shirt could have

originated from anyone other than the decedent or Defendant unless either had an identical twin. This conclusion does not assume that the random match probability is the same as the source probability (*i.e.*, the likelihood that Defendant and the decedent are the *sources* of the DNA). Rather, it offers an opinion regarding whether Defendant and the decedent are the sources of the DNA pursuant to the low random match probability. This is not a logical fallacy. Therefore, we hold that the trial court did not err — much less plainly err — in admitting the analyst's testimony.

After carefully reviewing the transcript and record, we are unable to find any possible prejudicial error at trial. The offenses in this case were clearly connected by a series of acts, and the trial court did not commit plain error in admitting the testimony of the SBI analyst. Accordingly, we find no error in Defendant's trial.

NO ERROR.

Judges STEELMAN and DAVIS concur.

Report per Rule 30(e).