**STATE v. RAGLAND**

[226 N.C. App. 547 (2013)]

---

STATE OF NORTH CAROLINA
v.
JOSEPH RAGLAND, Defendant

No. COA12-699

Filed 16 April 2013

1. **Appeal and Error—notice of appeal—pro se—no service on State—court to which appeal taken not identified**

   A *pro se* notice of appeal that was not served on the State and that did not identify the court to which appeal was taken was not dismissed where the State did not raise the lack of service and participated in the appeal, and the Court of Appeals was the only court with jurisdiction to hear the appeal.

2. **Evidence—objection—subsequent evidence without objection**

   There was no error in a rape and sexual offense prosecution where the State was allowed to introduce the victim's underwear over defendant's chain-of-custody objection and defendant did not object to subsequent testimony regarding cuttings from the underwear that were tested by a forensic scientist and a laboratory report from those tests.

**3. Witnesses—expert—properly    qualified—sexually    abused children**

There was a proper foundation for expert witness testimony in a rape and sexual offense prosecution where defendant did not dispute that the witness was properly qualified to testify regarding the characteristics of sexually abused children. Nothing in *State v. Streater*, 197 N.C. App. 632, suggests that any particular type of examination is necessary before an expert may testify about the profiles of sexually abused children.

**4. Appeal and Error—preservation of issues—not argued on appeal—no objection to subsequent testimony—plain error not argued**

An issue regarding the testimony of an expert, behavioral theories, and the victim's behavior in a rape and sexual offense prosecution was not properly before the Court of Appeals where defendant did not argue on appeal that the trial court erred in allowing the initial testimony regarding behavioral histories, did not object to subsequent testimony, and did not argue plain error.

**5. Appeal and Error—preservation of issues—failure to object at trial—plain error not argued**

The Court of Appeals did not address a challenge to testimony where defendant did not object at trial or argue plain error on appeal.

**6. Evidence—DNA—prosecutor's fallacy**

Testimony in a rape and sexual offense prosecution erroneously assumed that the random match probability of DNA was the same as the probability that the defendant was not the source of the DNA sample, which is known as the prosecutor's fallacy.

**7. Evidence—DNA—prosecutor's fallacy—other evidence**

There was no prejudicial error from use of "the prosecutor's fallacy" regarding DNA evidence in a rape and sexual offense trial, given the other evidence.

Appeal by defendant from judgments entered 23 September 2011 by Judge William R. Pittman in Johnston County Superior Court. Heard in the Court of Appeals 15 November 2012.

*Attorney General Roy Cooper, by Assistant Attorney General John F. Oates, Jr., for the State.*

*Kimberly P. Hoppin for defendant-appellant.*

STATE v. RAGLAND

[226 N.C. App. 547 (2013)]

GEER, Judge.

Defendant Joseph Ragland appeals from his conviction of second degree rape, two counts of second degree forcible sex offense, and sexual servitude. On appeal, defendant primarily contends that the trial court committed plain error when it allowed the State's expert witness to testify that certain DNA evidence could have come from no one else in the world other than defendant. We agree that this testimony constituted the "prosecutor's fallacy" that the United States Supreme Court found improper in *McDaniel v. Brown*, 558 U.S. 120, 175 L. Ed. 2d 582, 130 S. Ct. 665 (2010) (per curiam). Nonetheless, given the State's overwhelming evidence, we hold defendant has failed to establish that the admission of this testimony was plain error.

## Facts

The State's evidence tended to show the following facts. Defendant was the pastor of The Books of Acts, Church of God and Christ Jesus in Angier, North Carolina. "Sarah" and her family began attending defendant's church three times a week when Sarah was seven years old.[1] Sarah worked in the church's daycare and performed "praise type" dance at the church on Sundays. Sarah believed defendant could heal and protect people and also withdraw his protection from them. Sarah's father, Mr. Mills, was head deacon in the church and her mother, Ms. Mills, was an evangelist in the church. Ms. Mills was having an affair with defendant prior to 11 April 2009.

In April 2009, Ms. Mills and Mr. Mills left the country for a vacation. Sarah was 16 years old at the time. While they were gone, Sarah stayed first with a family friend, Darlene Gilchrist, and then with her grandmother. It was arranged that Sarah would stay with defendant if, for some reason, she needed another place to stay.

Sarah got into a confrontation with her grandmother on Saturday, 11 April 2009. Sarah's parents were scheduled to return from vacation the following day, Easter Sunday. Ms. Mills spoke with Sarah's grandmother, learned of the confrontation, and later spoke with defendant. Ms. Mills and defendant decided Sarah could stay with defendant and his wife for the night. Defendant picked up Sarah from her grandmother's house and drove Sarah to his house. Sarah believed she was going to go shopping with defendant's wife.

---

1. The pseudonyms "Sarah," "Mr. Mills," and "Ms. Mills" are used throughout this opinion to protect the child's privacy and for ease of reading.

When they arrived at defendant's house, nobody else was home, and defendant instructed Sarah to put her bags in his son's room. Sarah asked if she could take a shower before leaving to shop with defendant's wife. After she had showered, Sarah went back to the son's room. Defendant knocked and, when Sarah answered the door, forced his way into the bedroom. Defendant handed Sarah a cup of beer and told her to drink it. He then asked Sarah to fix a computer in another room. When Sarah moved the mouse of the computer, a video appeared on the monitor of two people having sex. Sarah then returned to the son's bedroom where defendant remained.

Defendant attempted to persuade Sarah to let him give her a massage, but Sarah repeatedly told him "no." Defendant then forced Sarah down on the bed and rubbed lotion all over her body while she screamed "no" and asked to be taken home. Defendant told Sarah, "I'm going to tell you what to do and you're going to do exactly what I say." Defendant then told Sarah, "I'm going to make you nut [sic] today" and penetrated her vagina with his fingers. Defendant next performed cunnilingus on Sarah against her will. Sarah was "moving and screaming and yelling" for defendant to stop. Defendant also penetrated Sarah's anus with his fingers. Finally, defendant forcefully engaged in vaginal intercourse with Sarah while she physically resisted. When defendant finished, he released Sarah and left the room momentarily.

Before Sarah could completely dress, defendant returned to the room and threatened her: "[I]f you tell anybody, I'm going to smack you so hard you'll have to wear a wig on your head." For the next 15 minutes, while Sarah stood in a corner of the room, defendant told Sarah about how he was "God's gift to women." Defendant forced Sarah to bend over, and he engaged in anal intercourse with her.

After defendant finished, he left the room and barred Sarah's path to the door of the house. He told Sarah they were going to eat pizza, he called to order a pizza, and he told Sarah to sit in the living room with him while he watched television. After the pizza was delivered, defendant told Sarah to eat – he threatened that if she did not, she "was going to get in trouble."

After eating, defendant told Sarah that they were "going to do this one more time." He took her to his son's room again, stripped off her clothes, and again engaged in vaginal intercourse with her. Defendant then told Sarah to go to sleep and left the room. Sarah could hear defendant walking about the house and was scared to move.

The next morning, Easter Sunday, defendant entered his son's bedroom and asked Sarah where he should take her. Sarah asked to be driven to the house of Ms. Gilchrist, the family friend. On the drive over, defendant told Sarah that she should forgive him because God already had. He also instructed her to shower and douche when she got home. As Sarah exited defendant's truck, defendant said, "[D]on't ever tell anybody because I'm going to turn you into a frog."

Once inside, Sarah used Ms. Gilchrest's phone to call her mother and told her mother that defendant raped her. Sarah told nobody else at that time. Once back at her own house, Sarah told her uncle that she did not want to attend defendant's church and instead went to church with her grandmother. Sarah called a member of defendant's church and said she was sick and could not dance for the Easter services. Sarah never changed the clothes she was wearing while at defendant's house. She attended church wearing a large coat over the clothes. Sarah's uncle noted that Sarah did not dress as she regularly did for church, did not dress appropriately for the weather, was ill-tempered, and was not her usual self that day.

Sarah's parents returned from their trip close to midnight and took Sarah to WakeMed Hospital. At WakeMed, a physician's assistant, Katherine Hardy, and a nurse, Leslie Duran, took statements from Sarah, examined Sarah, and collected a rape kit. Ms. Hardy noted that Sarah had a "friable cervix . . . at the 6:00 position." Deputy Dwayne Medlin with the Johnston County Sheriff's Office also interviewed Sarah and then took the completed rape kit and a bag of Sarah's clothing from Nurse Duran.

Laboratory tests on vaginal swabs collected with the rape kit revealed sperm with a DNA profile that matched defendant's DNA. Tests on the rectal swabs revealed sperm with a mixture of DNA -- defendant's and Sarah's DNA profiles could not be excluded as contributors to the mixture. In addition, sperm with DNA matching defendant's DNA was found in cuttings from Sarah's panties, along with a reaction consistent with the presence of human saliva.

On 2 November 2009, defendant was indicted for second degree rape, rape by a custodian, two counts of second degree forcible sex offense, two counts of sex offense by a custodian, and two counts of crime against nature. On 1 August 2011, defendant was additionally indicted for first degree kidnapping and three counts of sexual servitude. On 23 September 2011, the State dismissed two counts of sex offense by a custodian, two counts of crime against nature, two counts

of sexual servitude, and the first degree kidnapping charge. According to the transcript, the charge of rape by a custodian was also dismissed, although the dismissal was omitted from the record.

Defendant testified in his own defense at trial. He denied engaging in any sexual activity with Sarah and stated that Sarah's mother wanted defendant destroyed because he had ended their affair. He testified that on the Friday before Ms. Mills left for her week-long trip, she called him to come over, and they had sexual intercourse using a condom. Ms. Mills then removed the condom from defendant using a dry bath cloth, and defendant left. Later that day, when Ms. Mills called asking defendant to return, defendant told Ms. Mills that their affair was over.

Defendant also testified that Sarah stayed at his house on the night of 11 April 2009. Defendant spent much of the evening preparing a barbeque hog for Easter Sunday and only periodically checked on Sarah. He ordered a pizza for them at some point.

The jury found defendant guilty of second degree rape, two counts of second degree forcible sex offense, and sexual servitude. The trial court sentenced defendant to three consecutive, presumptive-range terms of 72 to 96 months imprisonment. Defendant filed a timely written pro se notice of appeal. His appellate counsel has filed a petition for writ of certiorari because of possible defects in that notice of appeal. The State, in response to the petition, has asserted that it "takes no legal position regarding the disposition of this petition."

## Discussion

[1] We first address defendant's notice of appeal. While defendant's written notice of appeal was timely, the record contains no indication that defendant served the notice of appeal on the State. However, "a party upon whom service of notice of appeal is required may waive the failure of service by not raising the issue by motion or otherwise and by participating without objection in the appeal." *Hale v. Afro-Am. Arts Int'l, Inc.*, 335 N.C. 231, 232, 436 S.E.2d 588, 589 (1993). Here, the State has not raised the issue of lack of service of the notice of appeal by motion or otherwise and has participated without objection in the appeal by filing its brief. Accordingly, under *Hale*, any objection to the lack of service has been waived.

In addition, in violation of Rule 4(b) of the Rules of Appellate Procedure, defendant's written notice of appeal does not designate the court to which appeal was taken. This Court has held, however, "that

[an appellant's] failure to designate this Court in its notice of appeal is not fatal to the appeal where the [appellant's] intent to appeal can be fairly inferred and the [appellees] are not mislead [sic] by the [appellant's] mistake." *Phelps Staffing, LLC v. S.C. Phelps, Inc.*, 217 N.C. App. 403, 410, 720 S.E.2d 785, 791 (2011). Here, defendant's intent to appeal is plain, and since this Court is the only court with jurisdiction to hear defendant's appeal, it can be fairly inferred defendant intended to appeal to this Court. The State does not suggest that it was in any way misled by the notice of appeal.

Accordingly, defendant's failure to serve the notice of appeal and his mistake in failing to name this Court in his notice of appeal do not warrant dismissal. We, therefore, dismiss the petition for writ of certiorari.

I

**[2]** Defendant first contends that the trial court erred in admitting evidence regarding Sarah's panties because the State did not lay a proper foundation for admission of the evidence. Defendant argues that although Deputy Medlin testified that the examining nurse gave him "a bag of clothes that [Sarah] was wearing when the event occurred" and he assumed the panties were in the bag, there was no testimony from the examining nurse as to whether the panties came from Sarah or how or by whom the panties were collected. Defendant has not, however, preserved this argument for appellate review.

Deputy Medlin testified that he placed the clothes, including the panties, in a paper bag that was in turn sealed in a container stored in the evidence room. The panties were ultimately identified as State's Exhibit 10. Defendant objected to the admission of State's Exhibit 10 on the grounds that the State failed to lay a proper foundation. Defense counsel argued that the nurse who gave the deputy the clothes had not testified and, therefore, the State had not proven that the clothes, including the panties, in fact came from Sarah. The trial court overruled defendant's objection and admitted State's Exhibit 10.

Subsequently, however, defendant did not object during the direct examination of forensic scientist Jessica Posto to the admission of State's Exhibit 43E, which included cuttings from the panties that were contained in State's Exhibit 10. Those cuttings, admitted without objection, were tested and revealed the presence of sperm and reactions consistent with the presence of human saliva. Further, the State introduced, without objection, Ms. Posto's report of her laboratory analysis of the panties contained in State's Exhibit 10.

It is well established that " '[w]here evidence is admitted over objection and the same evidence has been previously admitted or is later admitted without objection, the benefit of the objection is lost.' " *State v. Perry,* 159 N.C. App. 30, 36, 582 S.E.2d 708, 713 (2003) (quoting *State v. Alford,* 339 N.C. 562, 570, 453 S.E.2d 512, 516 (1995)). In *Perry,* the State admitted through one witness, over the defendant's objection, a copy of a document called a "nutriscription." *Id.* At some other point during the trial, however, when the State introduced the original "nutriscription" and medical records pertaining to it through a different witness, the defendant did not object. *Id.* Accordingly, the Court held: "By failing to object to the later admission of the same evidence, defendant has waived any benefit of the original objection and failed to preserve the issue for appeal." *Id.* at 37, 582 S.E.2d at 713.

Here, while defendant did object to the admission of the panties, he did not object to the admission of cuttings from those panties or the report describing the testing of the panties. As a result, he waived his initial objection. Since defendant does not specifically argue plain error on appeal, we do not address this issue further. *See State v. Wright,* 210 N.C. App. 697, 703, 709 S.E.2d 471, 475 ("Defendant failed to 'specifically and distinctly' contend that the trial court's jury instructions on first-degree burglary amounted to plain error. Therefore, this issue has been waived on appeal and is dismissed."), *disc. review denied,* 365 N.C. 332, 717 S.E.2d 394 (2011).

## II

[3] Defendant next argues that the trial court erred in admitting portions of the expert testimony of Dr. Sharon Cooper. First, defendant argues that the trial court erred in permitting Dr. Cooper to give the following expert opinion:

> Based upon my fundamental knowledge in this area, my experience in treating patients, and my evaluation of this particular patient and her family as well as my review of all of the investigative records and the medical records in this particular case, it is my medical opinion to the degree of reasonable certainty that the history provided in this case, the behaviors that were described about this child and the DSM-IV diagnoses that she had as well as the laboratory findings and the physical exam findings of this patient *were consistent with those types of findings seen in victims in child sexual abuse and sexual assault.*

(Emphasis added.)

Our Supreme Court has held that "[i]n a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has *in fact* occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility. However, an expert witness may testify, upon a proper foundation, as to the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent therewith." *State v. Stancil*, 355 N.C. 266, 266-67, 559 S.E.2d 788, 789 (2002) (per curiam) (internal citations omitted). Defendant argues that the State did not lay the "proper foundation" required by *Stancil* because Dr. Cooper conducted only a single, one hour and 20 minute interview with Sarah and did not personally conduct a physical examination of Sarah.

We believe that defendant has misconstrued *Stancil*'s reference to a "proper foundation." In support of its holding that experts could testify upon a proper foundation as to whether a complainant had characteristics consistent with those of sexually-abused children, the *Stancil* Court cited *State v. Hall*, 330 N.C. 808, 412 S.E.2d 883 (1992), and *State v. Kennedy*, 320 N.C. 20, 357 S.E.2d 359 (1987). Both of those cases held that a witness may give an opinion that a child's profile is consistent with that of a sexually-abused child if the witness is a properly qualified expert. *See Hall*, 330 N.C. at 818, 412 S.E.2d at 888 (explaining that "[o]nly an expert in the field may testify on the profiles of sexually abused children and whether a particular complainant has symptoms or characteristics consistent with this profile"); *Kennedy*, 320 N.C. at 32, 357 S.E.2d at 366 (upholding admissibility of witnesses' testimony because, "[w]here scientific, technical, or other specialized knowledge will assist the fact finder in determining a fact in issue or in understanding the evidence, an expert witness may testify in the form of an opinion, N.C.R. Evid. 702[;] . . . the expert may testify as to the facts or data forming the basis of her opinion, N.C.R. Evid. 703"; and the challenged testimony of the experts in that case, "if believed, could help the jury understand the behavior patterns of sexually abused children and assist it in assessing the credibility of the victim").[2]

We, therefore, believe, and hold, that the Supreme Court's requirement of a proper foundation addresses the question whether the expert

---

2. The *Stancil* Court additionally cited *State v. Aguallo*, 322 N.C. 818, 823, 370 S.E.2d 676, 678 (1988), which held that an expert was properly permitted to give an opinion that a physical examination of the victim revealed findings consistent with the presence of vaginal trauma because that "opinion did not comment on the truthfulness of the victim or the guilt or innocence of defendant."

witness possesses the necessary educational and experiential qualifications to testify regarding the characteristics of sexually-abused children and whether the complaining witness possessed those characteristics. *See also State v. Ware*, 188 N.C. App. 790, 798, 656 S.E.2d 662, 667 (2008) (holding that expert was qualified to testify regarding sexually-abused children based on witness' education, professional license, and experience). Here, defendant does not dispute that Dr. Cooper was properly qualified to testify as an expert regarding the characteristics of sexually-abused children. The State, therefore, laid a proper foundation for Dr. Cooper's opinion under *Stancil*.

Defendant, however, quotes *State v. Streater*, 197 N.C. App. 632, 641, 678 S.E.2d 367, 373 (2009) (emphasis added), in which this Court explained that "[t]he proper foundation is a predicate to the admission of expert opinion" and, "[i]n a sex abuse case, a physical examination and an interview with the victim *can* lay the proper foundation for expert testimony." *Streater* did not, however, address the foundation required for testimony that a victim has symptoms or characteristics consistent with profiles of sexually-abused children. Instead, the Court found impermissible the State's leading questions to the expert that assumed a fact not in evidence: that the victim had specifically told the expert that the defendant was the man who had sexually abused her. *Id.* at 641-42, 678 S.E.2d at 374. The Court's reference to the lack of "proper foundation" for the leading questions related only to the lack of testimony by the expert that the victim had specifically identified the defendant. *Id.* Nothing in *Streater* suggests that any particular type of examination is necessary before an expert may testify about the profiles of sexually-abused children.

[4] Defendant next argues that Dr. Cooper impermissibly vouched for Sarah's credibility. Dr. Cooper initially testified to the following:

> We use behavioral histories in order to help us to get a feel
> for false allegations. For example, if a victim is making
> a false allegation, they usually will not be able to tell us
> they're having intrusive thoughts almost every day about
> what has happened to them, that their grades declined significantly and that they would go from an A student to an
> F student. They would not know that -- they would have
> nightmares regarding fearfulness. It's specific to this particular event. A victim who is making a false allegation
> would not be able to demonstrate what we would refer to

as an acute stress reaction or psychological shock as other
people would notice[.]

At that point, defendant objected and, outside the presence of the jury,
defense counsel argued, "Your Honor, I think during the voir dire of the
witness, counsel was not going to ask her whether her examination of
the witness would be on the issue of whether or not she was raped.
Yet the questions he's asking her and her answers are the same thing."
Defense counsel additionally asserted: "The child wouldn't do this unless
this happens. This is how she's phrasing it." The trial court ruled that Dr.
Cooper was permitted to testify that Sarah's behaviors were consistent
with sexual abuse, but cautioned the State to "[s]tay away from the part
whether she thinks she's telling the truth."

Subsequently, defendant did not object when Dr. Cooper testified
that (1) Sarah's curling up in a fetal position next to a heater was charac-
teristic of a person with acute stress reaction; (2) Sarah's transition from
being a "straight A student" to "making F's" indicated that Sarah "was
so psychological [sic] dysfunctional that she couldn't deal with" school;
and (3) as of the time of trial, Sarah still exhibited some post-traumatic
stress symptoms and "still does have intrusive thoughts of what has hap-
pened to her." Defendant contends that "[t]hese subsequent statements,
after her recent prior comments regarding false allegations, inferred
[sic] Dr. Cooper's opinion that Sarah was not making a false allegation
because she exhibited the behaviors Dr. Cooper had just described as
being evidence that one was not making false allegations."

Defendant does not make any argument on appeal that the trial
court erred in allowing the initial testimony regarding behavioral histo-
ries. Although he points to the combined effect of that initial testimony
and the subsequent description of Sarah's behaviors as resulting in an
impermissible expert opinion on Sarah's credibility, he did not object
to that subsequent testimony and does not argue plain error on appeal.
That issue is not, therefore, properly before this Court. *See Wright*, 210
N.C. App. at 703, 709 S.E.2d at 475 (dismissing unpreserved argument
where defendant did not specifically argue plain error on appeal).

[5] We likewise do not address defendant's final challenge to Dr. Cooper's
testimony that Sarah had "the ability to actually say exactly what time
each of those sexual events occurred, the oral sex, the anal sex, the
vaginal sex. They occurred at three different times overnight for that
child." While defendant argues that "[t]his was an affirmative statement
that the assaults happened, and that they happened in the way Sarah had

reported," defendant again did not object at trial and does not argue on appeal that admission of this statement was plain error.

III

**[6]** Defendant next argues that the trial court committed plain error in admitting certain expert testimony regarding DNA evidence because that testimony amounted to a "prosecutor's fallacy."

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice -- that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the exceptional case, the error will often be one that seriously affect[s] the fairness, integrity or public reputation of judicial proceedings[.]

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal citations and quotation marks omitted).

The United States Supreme Court described the "prosecutor's fallacy" in *McDaniel*, 558 U.S. at 128, 175 L. Ed. 2d at 588, 130 S. Ct. at 670. The fallacy involves the use of DNA evidence to show "random match probability." *Id.* Random match probability evidence is the probability that another person in the general population would share the same DNA profile as the person whose DNA profile matched the evidence. *Id.* at 124, 175 L. Ed. 2d at 585, 130 S. Ct. at 668. For example, in *McDaniel*, the State's expert tested semen from the victim's underwear and from a rape kit and determined that the DNA obtained from those tests matched the defendant's DNA "and that the probability another person from the general population would share the same DNA (the 'random match probability') was only 1 in 3,000,000." *Id.*

Regarding the fallacy, the Court in *McDaniel* explained, "[t]he prosecutor's fallacy is the assumption that the random match probability is the same as the probability that the defendant was not the source of the DNA sample." *Id.* at 128, 175 L. Ed. 2d at 588, 130 S. Ct. at 670. "In other words, if a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found

at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy." *Id.*

In *McDaniel,* the defendant did not challenge the State's expert's random match probability opinion "that only 1 in 3,000,000 people would have the same DNA profile as the rapist." *Id.*, 130 S. Ct. at 671. However, the Court explained that the State's expert failed to properly dispel the prosecutor's fallacy "when the prosecutor asked [the State's expert], in a classic example of erroneously equating source probability with random match probability, whether 'it [would] be fair to say . . . that the chances that the DNA found in the panties – the semen in the panties -- and the blood sample, the likelihood that it is not [the defendant] would be .000033,' " and the State's expert "ultimately agreed that it was 'not inaccurate' to state it that way." *Id.* at 128-29, 175 L. Ed. 2d at 588, 130 S. Ct. at 671.

Here, defendant correctly asserts that the testimony of one of the State's experts, Agent Sharon Hinton from the State Crime Lab, improperly relied upon the prosecutor's fallacy. Agent Hinton testified that the State Crime Lab has a population database for North Carolina residents which is used to determine how common a particular DNA profile is in the general population of North Carolina. She further testified that analysts at the lab use certain characteristics of a DNA sample "to determine a person's . . . frequency in the general population." Agent Hinton then testified as follows:

> Q. And how do you use this particular database in your case work?
>
> A. Like I said, if you have a match between a case, we need to know how popular or how common that profile is. With a straight match means [sic] that there's no mixture. There's only one profile in – on a piece of evidence. You calculate to see how common that profile is to that known standard. *And if it's over the world's population, then you know that there could be no one else other than that person in the world.*

(Emphasis added.)

Regarding her statistical conclusions in the present case, Agent Hinton testified to the following:

> The DNA profile obtained from the sperm fractions from the vaginal swabs and sperm fractions from the cutting

of the panties *matched the DNA profile obtained from Joseph Ragland* and did not match the profile obtained from [Sarah].

. . . .

. . . The probability of randomly selecting an unrelated individual with the DNA profile that matches the DNA profile obtained from the sperm fractions of the vaginal swabs and the sperm fractions from the cutting from the panties is greater than 1 trillion, which is more than the world's population for North Carolina Caucasian, Black, Lumbee Indian and Hispanic populations. *Meaning that anything over the world's population, like I said earlier, can be no one other than that person.*

(Emphasis added.)

Thus, the agent effectively testified that defendant's DNA profile matched the DNA profile obtained from the vaginal swabs and the panties and that the probability that a different, unrelated person in the general population was the source of that DNA was zero. The testimony therefore erroneously assumed "that the random match probability is the same as the probability that the defendant was not the source of the DNA sample." *Id.* at 128, 175 L. Ed. 2d at 588, 130 S. Ct. at 670.

[7] Having concluded that this testimony was inadmissible, we must additionally determine whether that inaccurate testimony had a probable impact on the jury's verdicts. Defendant argues that admission of the evidence was plain error as to the second-degree rape charge, the sexual servitude charge, and the charge for second-degree sex offense that required the State to prove that defendant engaged in anal intercourse with Sarah. We disagree.

The State presented substantial physical evidence showing that defendant engaged in vaginal and anal intercourse with Sarah. With respect to vaginal intercourse, Ms. Hardy testified that, upon examination at the hospital, Sarah had "a friable cervix," meaning there was "an abrasion" on Sarah's cervix and that it looked like "if you touched it, it would bleed very easily." Dr. Cooper similarly testified that Sarah had a friable cervix, such that the tissue would bleed easily, and that a friable cervix "can be seen when there has been trauma to the cervix." Dr. Cooper further explained that the friable cervix was consistent with "really forcible vaginal intercourse." Finally, Dr. Cooper testified that the fact that Sarah's cervix was friable at the "6:00 position" indicated that

Sarah had had forcible intercourse with her legs high up over her shoulders. Sarah testified that, when defendant raped her vaginally, she was positioned with her legs high over defendant's shoulders.

Moreover, the State's evidence also showed that fully-intact sperm were found in Sarah's vagina, anus, and panties. Dr. Cooper testified that sperm in those situations would begin to break down in about 24 hours, indicating that the sperm found in Sarah's vagina, anus, and panties had been there for less than a day.

In addition, defendant does not dispute that the DNA evidence obtained from the vaginal swabs and the panties matched defendant and that Agent Hinton *properly* testified that "[t]he probability of randomly selecting an unrelated individual with the DNA profile that matches the DNA profile obtained from the sperm fractions of the vaginal swabs and the sperm fractions from the cutting from the panties is greater than 1 trillion, which is more than the world's population for North Carolina Caucasian, Black, Lumbee Indian and Hispanic populations." This powerful DNA evidence was not rendered inadmissible because of the subsequent inaccurate statement based upon the prosecutor's fallacy. *See id.* at 132, 175 L. Ed. 2d at 590, 130 S. Ct. at 672-73 (explaining that defendant's expert's contention that State's expert erroneously failed to dispel the prosecutor's fallacy "provided no warrant for entirely excluding the DNA evidence or [the State's expert's] testimony" because the defendant's expert "did not contest that the DNA evidence matched [the defendant]" and "[t]hat DNA evidence remains powerful inculpatory evidence even though the State concedes [the State's expert] overstated its probative value by failing to dispel the prosecutor's fallacy").

The State also presented powerful, unchallenged DNA evidence obtained from the rectal swabs. Agent Hinton testified that defendant "could not be excluded as a contributor" to the mixture of DNA found on the rectal swabs and that the probability that a random, unrelated person chosen from the general population of North Carolina could not be excluded as a contributor was as follows:

> [F]or the North Carolina Caucasian population, 1 in 3.55 million; North Carolina Black population, 1 in 11.6 million; North Carolina Lumbee Indian population is . . . 1 in 5.22 million; and the North Carolina Hispanic population is 1 in 9.07 million.

Also regarding anal intercourse, Dr. Cooper testified that the most common symptoms that victims of anal rape describe are pain and trouble

having a bowel movement and that Sarah's medical records show that Sarah described abdominal pain and difficulty having bowel movements when she reported to the hospital.

In addition to the physical evidence, the State presented the testimony of Sarah describing in detail two incidents of vaginal intercourse and one incident of anal intercourse. Sarah's testimony was corroborated by her prior consistent statements.

Thus, given the properly-admitted forensic evidence, the expert testimony, Sarah's testimony, and the corroborating testimony, we cannot conclude that the jury would probably have reached a different verdict in the absence of the prosecutor's fallacy evidence. Defendant has, therefore, failed to show plain error.

No error.

Judges STEPHENS and McCULLOUGH concur.