An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 25-643

Filed 18 March 2026

Nash County, Nos. 22CR329866-630, 23CR000546-630, 23CR000547-630

STATE OF NORTH CAROLINA

v.

HERMAN ANTHONY MAYNOR, Defendant.

Appeal by defendant from judgment entered 13 November 2024 by Judge Timothy W. Wilson in Nash County Superior Court. Heard in the Court of Appeals 24 February 2026.

> *Attorney General Jeff Jackson, by Special Deputy Attorney General Torrey D. Dixon, for the State.*

> *W. Michael Spivey, for defendant-appellant.*

FLOOD, Judge.

Defendant Herman Anthony Maynor appeals from his convictions for assault with a deadly weapon inflicting serious injury, possession of a firearm by a felon, and attaining the status of a habitual felon. On appeal, Defendant argues his conviction for assault with a deadly weapon inflicting serious injury should be vacated because the trial court erred, first, by giving an inaccurate or misleading jury instruction

regarding Defendant's right to use self-defense, and second, by instructing the jury that Defendant would not be entitled to the benefit of self-defense if he was committing the felony of possession of a firearm by a felon. After careful review, we hold the trial court did not err when instructing the jury regarding Defendant's right to use self-defense where the trial court gave a complete self-defense instruction. Further, we hold the trial court did not plainly err by instructing the jury that Defendant was not entitled to the benefit of self-defense where Defendant conceded he was committing the felony of possession of a firearm by a felon, and the State presented sufficient evidence of a causal nexus between Defendant's possession of a firearm and the circumstances in which the victim was assaulted.

## I. Factual and Procedural Background

On 27 October 2022, Defendant, Jimmie Harrison, and Stanley ("Bobo") Avent drove to 1207 Boone Street, Rocky Mount, North Carolina to pick up items that belonged to Defendant's niece, Chandra Parker. At that time, Chandra was in the process of moving out of the house in which she and her boyfriend, Andre Avent,[1] had been living. Chandra had packed up some of her belongings and stored them in a barn that was "maybe 25 steps" away from the house. One of the items that Defendant, Jimmie, and Bobo went to move from the barn was a pool table.

When they arrived, Defendant told Andre that he was coming to finish packing Chandra's things and to sell the pool table to Jimmie and Bobo. Defendant tried

---

[1] Andre testified that Bobo is a distant relative of his.

moving the table but could not move it because it was too heavy. Andre then told Jimmie and Bobo that they could have the pool table for free if they could get it out of the barn. According to Andre, this made Defendant "furious."

At some point, Curtis Underwood, Defendant's nephew, pulled into the yard and started talking with Andre. As Jimmie and Bobo were loading the pool table onto the trailer, Jimmie heard an argument between Andre and Curtis "about dogs." After a few minutes, Curtis left. According to Jimmie, Andre was talking to him about his disagreement with Curtis when Andre unexpectedly pulled out a small pistol, stuffed it back into his pocket, walked over to the wall, pulled a rifle "away from the wall," and said "I got this gun for things like this . . . ." Eventually, Defendant, Jimmie, and Bobo loaded the pool table onto the truck, as well as tools, a very large radio that Defendant had sold to Bobo, and boxes filled with other items. After the three men finished loading the truck, they left.

The next morning, Andre was outside feeding the dogs when Bobo came over to the house to return the large radio Defendant had sold to him the night before. Bobo put the radio back in the barn, but before he could leave, Andre told Bobo that he believed there was "going to be some trouble behind this radio."

Sometime after Bobo left, Andre saw Darrel Parker, Chandra's brother, pull into the driveway. Darrel, who had brought his four-year-old grandson with him, had come to the house to get Chandra's social security card and identification. Darrel knocked on the door, but when no one answered, he walked back to his car. Darrel

was standing by his car when Andre came out, and the two started talking. As they were talking, Defendant pulled up with another man, later identified as Tyreik Battle, and with a trailer attached to the back of his truck. Testimony is conflicting as to the events that occurred after Defendant pulled up.

According to Andre, he saw Defendant pull up and park on Boone Street in front of the house. Defendant started walking in the yard when Andre noticed a gun in Defendant's hand. "The first thing that came out of [Andre's] mouth" was that the "radio is in the barn" and that Defendant could go back there and get it. Andre explained that Defendant then told Darrel to "move to the side, I'm about to kill" Andre because he has "been talking about my family." Andre replied, "I don't talk about your family; I don't even deal with your family. . . the only thing I'm trying to do is pack my things up to leave here." Defendant then "started firing." Defendant "hit [Andre] twice in [his] hand." Andre tried calling 911, but Defendant shot through his phone and hit Andre's forefinger. "[S]tanding still[,]" Andre looked at Defendant "like I can't believe you came here to do this, you came here to kill me." Defendant then shot Andre in his ankle and his thigh. Andre, who had been standing on the passenger side of Darrel's car, moved to the driver's side, pulled out his gun, a Baretta 9mm, and started firing back. While still shooting at Andre, Defendant ran back to his truck, and Andre started walking towards the truck. Defendant got in his truck, started driving, and continued to "shoot[] out the truck with his left hand." Andre kept shooting at the truck "until [he] ran out of bullets."

According to Darrel, who testified for the State, Defendant pulled up in his vehicle with a trailer, parked on Boone Street, and started walking to the backyard. As Defendant was walking to the backyard,

> Andre was trying to feel, kind of trying to like go in this pockets and try to get whatever, I don't know, a gun or something, I didn't know at the time. But then [Defendant] was like, no, no, no, don't do it; don't do it; don't do it; you know, like don't pull it; don't pull it out, whatever, like that. I mean and it happened so fast so I mean I guess then I heard shot. I guess that's how he got shot. After it [sic] was fumbling I was just watching my grandson after that. He start[ed] crying and everything.

As Defendant was telling Andre "no, no, no," Darrel saw Defendant trying to "hold" Andre's hand, and "[t]hat's when the first shot [was] fired." Concerned for his grandson's safety, Darrel managed to get in his car and leave. As he was driving down Boone Street, he looked in his "back window" and saw "Andre running back up to [Defendant's] truck . . . holding his hand like running back up to the truck." After driving "two, three blocks[,]" Darrel came back to the house.

According to Tyreik, who testified for Defendant, after arriving at the house, Defendant walked—with a cane—to where Andre and Darrel were standing and talking. Tyreik was standing by the trunk of Defendant's vehicle but could hear the men talking "about some speakers, a pool table, something of that sort . . . ." From Tyreik's point of view, he could see that Andre had his hands in his coat pocket, and it "looked like he was grabbing for his gun." He then heard Defendant tell Andre, "don't pull it out" three times. Tyreik testified that Andre

> eventually pulled it out and raised it and at that time I went around the back of the truck and got in and next shots went off I seen him run past, like run past the car, come out and go diagonal and he start shooting. I threw my hands out the window like don't shoot and next thing you know he start shooting at the vehicle some more as I'm ducking down.

As he was ducking down, he heard bullets continue to strike the car, and one of the bullets grazed his back. Defendant then got in the vehicle, and they drove away.

Eventually, law enforcement officers responded to the scene and found shell casings in the roadway and blood on Darrel's vehicle. The officers then detained Darrel and took him to Rocky Mount Police Department for an interview. Andre was subsequently transported to Nash General Hospital, where he remained for five hours before being transported to Greenville Vidant Medical Center where he was treated for multiple injuries.

On 6 February 2023, Defendant was indicted for assault with a deadly weapon with intent to kill inflicting serious injury, discharging a firearm within city limits in violation of a city ordinance, and possession of a firearm by a felon. The State voluntarily dismissed the alleged city ordinance violation before trial.

Defendant's case came on for trial on 4 November 2024. At trial, one of the police officers who responded to the scene, Officer Dillon Crumpton, testified regarding the evidence he had found. Specifically, Officer Crumpton testified he had found "broken glass" and "three [.40 caliber] shell casings in the driveway of 1207

Boone Street." He also found "four shell casings located in the southbound lanes on Boone Street[;]" those four shell casings were 9mm caliber.

The State also admitted as evidence a video of Darrel's interview with Rocky Mount Police Detective Lamm. During the interview, Darrel told Detective Lamm that Defendant came up asking Andre, "whatcha got?" Darrel also told Detective Lamm that Defendant was the one who shot first, and he did not think Andre had pulled out his gun when he was shot.

At trial, Detective Lamm testified about his interview with Darrel and that, during the police investigation, the Rocky Mount Police Department used a software program, known as ShotSpotter, to "detect gunshots with a certain geographic location in Rocky Mount. It uses several sensors that pick up audio to help triangulate a precise location of where those shots were fired." Based on his review of a report generated by ShotSpotter, his interview with Darrel, and the other physical evidence, Detective Lamm believed that "the evidence from ShotSpotter corroborat[ed] . . . the statements made to [him] by [Darrel] and the [casings] that [were] collected from the scene."

At the beginning of the charge conference, the trial judge gave the State and defense counsel copies of pattern instructions it intended to give, listed the proposed jury instructions, and highlighted a few issues for the parties to think about overnight. Among these proposed jury instructions were the following: N.C.P.I.– Crim. 208.10, which is the substantive instruction on assault with a deadly weapon

with intent to kill inflicting serious injury; N.C.P.I.–Crim. 308.45A, which is a self-defense example including N.C.P.I.–Crim. 208.10 for all assaults involving deadly force; and N.C.P.I.–Crim. 308.90, which is the instruction for when justification for defensive force is not available to a defendant committing a felony. After the charge conference resumed the next morning, the trial court gave the parties a fresh set of proposed instructions and informed them that all the instructions were the same except for one unrelated jury instruction, which the parties discussed at length. The trial judge then charged the jury according to the agreed-upon instructions. Defense counsel did not object to the jury instructions.

On 13 November 2024, the jury returned verdicts finding Defendant guilty of assault with a deadly weapon inflicting serious injury, possession of a firearm by a felon, and being a habitual felon. The trial court subsequently consolidated Defendant's convictions into one judgment and sentenced Defendant to a term of 96 to 128 months of imprisonment.

Defendant timely filed his notice of appeal on 21 November 2024, but his notice of appeal did not state the court to which appeal was taken nor did it show service upon the State. Further, rather than specifying the judgment from which he was appealing, Defendant wrote he wanted to appeal his "court dision [sic]."

## II. **Jurisdiction**

As an initial matter, we must address whether we have jurisdiction to hear Defendant's appeal. Defendant concedes his written notice of appeal may violate Rule

4 of the Rules of Appellate Procedure because it did not identify the court to which the appeal was taken, did not specify the judgment from which he was appealing, and did not indicate it was served upon the State. Acknowledging these defects, Defendant filed a petition for writ of certiorari ("PWC") contemporaneously with his brief, asking this Court to issue a writ of certiorari pursuant to Rule 21(a)(1) of the North Carolina Rules of Appellate Procedure to review his convictions.

A criminal defendant must give notice of appeal "within the time, in the manner and with the effect provided in the rules of appellate procedure." N.C.G.S. § 15A-1448 (2023). Under Rule 4 of the Rules of Appellate Procedure, a criminal defendant may give "oral notice of appeal at trial" or file a notice of appeal "with the clerk of superior court and serving copies thereof upon all adverse parties within fourteen days after entry of the judgment or order . . . ." N.C. R. App. P. 4(a) (2025). Where a defendant files a written notice of appeal, the notice of appeal "shall specify the party or parties taking the appeal; shall designate the judgment or order from which appeal is taken and the court to which appeal is taken; and shall be signed by counsel of record for the party or parties taking the appeal, or by any such party not represented by counsel of record." N.C. R. App. P. 4(b) (2025).

This Court has held that "a defendant's failure to designate this Court in a notice of appeal does not warrant dismissal of the appeal where this Court is the only court possessing jurisdiction to hear the matter and the State has not suggested that it was misled by the defendant's flawed notice of appeal." *State v. Sitosky*, 238 N.C.

App. 558, 560 (2014), *writ denied,* 368 N.C. 237 (2015) (citing *State v. Ragland*, 226 N.C. App. 547, 552–53 (2013)); *State v. Wilson*, 296 N.C. App. 768, 770 (2024) ("[T]his Court has recognized that such a nonjurisdictional defect in a notice of appeal should not result in loss of the appeal as long as the intent to appeal can be fairly inferred from the notice and the appellee is not misled by the mistake." (citation and internal quotation marks omitted)). Further, "[w]e have also deemed a defendant's notice of appeal sufficient to confer jurisdiction upon this Court when, despite an error in designating the judgment, the notice of appeal as a whole indicates the defendant's intent to appeal from a specific judgment." *Sitosky*, 238 N.C. App. at 560–61. Lastly, we have held that a defendant's failure to indicate service of notice of appeal on the State is a non-jurisdictional defect because "it is the *filing* of the notice of appeal that confers jurisdiction upon this Court, not the *service* of the notice of appeal." *State v. Jenkins*, 273 N.C. App. 145, 149 (2020) (internal brackets omitted) (proceeding to the merits of the defendant's appeal even though the defendant's notice of appeal did not indicate service on the State because "the State was informed of the appeal and was able to timely respond").

Here, although Defendant's notice of appeal did not state which court to which he was appealing, "[D]efendant's intent to appeal is plain, and since this Court is the only court with jurisdiction to hear [D]efendant's appeal, it can be fairly inferred [D]efendant intended to appeal to this Court." *See Ragland*, 226 N.C. App. at 553. Further, the Appellate Entries entered by the trial court on 25 November 2024

indicated that the trial court found Defendant "has given Notice of Appeal to the N.C. Court of Appeals[.]" And, despite failing to specify the judgment from which Defendant was appealing, it is clear from his notice of appeal that he wished to appeal the judgment entered in November 2024.

Lastly, although the Record does not indicate that Defendant's notice of appeal was served upon the State, the State was served with the proposed Record on Appeal and raised no objections and proposed no amendments within the time allowed. After the Record was settled and filed, the State participated in this appeal without objecting to any lack of service, "thereby waiving service of Defendant's notice of appeal." *See State v. Golder*, 257 N.C. App. 803, 804 (2018), *aff'd as modified,* 374 N.C. 238 (2020). As such, we dismiss Defendant's PWC as moot and proceed to the merits of his appeal.

### III. Analysis

On appeal, Defendant argues the trial court (A) erred by giving an inaccurate and misleading jury instruction regarding Defendant's right to use self-defense and (B) plainly erred in instructing the jury that Defendant would not be entitled to the benefit of using defensive force if he was committing the felony of possession of a firearm by a felon. We address each argument in turn.

### A. Self-Defense Jury Instructions

Defendant first argues the trial court erred by inaccurately instructing the jury on his right to use self-defense. Specifically, Defendant argues the trial court

instructed the jury "in a manner that effectively told the jury [that Defendant] had to retreat to his vehicle before defending himself from a deadly assault."

"[U]npreserved issues related to jury instructions are reviewed under a plain error standard, while preserved issues are reviewed under a harmless error standard." *State v. Collington*, 375 N.C. 401, 410 (2020). A party who wishes to challenge a portion of the jury charge must properly preserve the issue for appeal by objecting

> before the jury retires to consider its verdict, stating distinctly that to which objection is made and the grounds of the objection; provided that opportunity was given to the party to make the objection out of the hearing of the jury, and, on request of any party, out of the presence of the jury.

N.C. R. App. P. 10(a)(2) (2025). Where a party fails to object to a jury instruction, the party's claim regarding that instruction is unpreserved for appellate review and is thus subject to plain error review. *See State v. Gillard*, 386 N.C. 797, 828 (2024). Nevertheless, where a party requests an instruction during the charge conference, and the trial court promised to give the requested instruction but ultimately fails to give the promised instruction to the jury, the request of the instruction warrants "full review on appeal." *State v. Ross*, 322 N.C. 261, 265 (1988).

Here, Defendant argues this issue is preserved for full appellate review because "[t]he trial court promised to give a self-defense instruction at the charge conference[,]" and Defendant "was entitled to assume the promised instruction would be accurate." To support his proposition, Defendant relies on *State v. Lee*, where our

Supreme Court reviewed the defendant's challenge to the omission of a jury instruction for prejudicial error "[b]ecause the trial court . . . agreed to instruct the jury in accordance with N.C.P.I.–Crim. 206.10, [and] its omission of the required stand-your-ground provision substantively deviated from the *agreed-upon* pattern jury instruction[.]" 370 N.C. 671, 676 (2018) (citing *Ross*, 322 N.C. at 265) (emphasis added). *Lee* is distinguishable, however, because the trial court in the instant case did not deviate from the agreed-upon instructions while charging the jury. At no point during the charge conference did defense counsel object to or request the trial court modify N.C.P.I.–Crim. 308.45A. Moreover, defense counsel did not object to these instructions during or after the jury charge. Therefore, because Defendant failed to object to these jury instructions before the jury retired to consider its verdict, this issue is unpreserved. *See Gillard*, 386 N.C. at 828.

Since this issue is unpreserved and because Defendant "'specifically and distinctly' contend[s] that the alleged error constitutes plain error[,]" *see State v. Lawrence*, 365 N.C. 506, 516 (2012), we review the jury instructions for plain error. "The plain error rule is always to be applied cautiously and only in the exceptional case . . . ." *Id.* (citation modified). Under the plain error rule, the defendant must show three things:

> First, the defendant must show that a fundamental error occurred at trial. Second, the defendant must show that the error had a probable impact on the outcome, meaning that absent the error, the jury probably would have returned a different verdict. Finally, the defendant must show that

> the error is an exceptional case that warrants plain error
> review, typically by showing that the error seriously affects
> the fairness, integrity or public reputation of judicial
> proceedings.

*Gillard*, 386 N.C. at 820 (quoting *State v. Reber*, 386 N.C. 153, 158 (2024)). "[I]t is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *State v. Odom*, 307 N.C. 655, 661 (1983) (citation omitted).

Defendant, in the instant case, asserted the affirmative defense of self-defense. "Our statutes provide two circumstances in which individuals are justified in using deadly force, thus excusing them from criminal culpability." *Lee*, 370 N.C. at 675. First, under N.C.G.S. § 14-51.3(a),

> a person is justified in the use of deadly force and does not
> have a duty to retreat in any place he or she has the lawful
> right to be if either of the following applies:
>
> > (1) He or she reasonably believes that such force is
> > necessary to prevent imminent death or great bodily
> > harm to himself or herself or another.
> >
> > (2) Under the circumstances permitted pursuant to
> > [N.C.G.S. §] 14-51.2.

N.C.G.S. § 14-51.3(a) (2023). Second, under N.C.G.S. § 14-51.2, "a rebuttable presumption arises that the lawful occupant of a home, motor vehicle, or workplace reasonably fears imminent death or serious bodily harm when using deadly force at those locations . . . . This presumption does not arise in N.C.G.S. § 14-51.3(a)(1)." *Lee*, 370 N.C. at 675. According to both statutory provisions, "a person does not have a

duty to retreat[] but may stand his ground." *Id.* Therefore,

> wherever an individual is lawfully located—whether it is his home, motor vehicle, workplace, or any other place where he has the lawful right to be—the individual may stand his ground and defend himself from attack when he reasonably believes such force is necessary to prevent imminent death or great bodily harm to himself or another.

*State v. Bass*, 371 N.C. 535, 541 (2018).

"Where there is evidence that [the] defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in [the] defendant's evidence." *State v. Dooley*, 285 N.C. 158, 163 (1974). "In determining whether the instruction is supported by the evidence, the evidence must be viewed in the light most favorable to the defendant." *State v. Gomola*, 257 N.C. App. 816, 820 (2018). "[A] defendant entitled to *any* self-defense instruction is entitled to a *complete* self-defense instruction, which includes the relevant stand-your-ground provision." *Bass*, 371 N.C. at 542. "[T]he trial court must instruct the jury on a defendant's right to stand his ground, as that instruction informs the determination of whether the defendant's actions were reasonable under the circumstances, a critical component of self-defense." *Lee*, 370 N.C. at 675. "It is a well-established principle in this jurisdiction that in reviewing jury instructions for error, they must be considered and reviewed in their entirety." *State v. Carwile*, 297 N.C. App. 145, 157 (2024), *review denied,* 920 S.E.2d 856 (2025) (citation omitted). "Instructions that as a whole present the law fairly and accurately to the jury will be upheld." *State v. Roache*, 358 N.C. 243, 303 (2004).

Here, the trial court instructed the jury on Defendant's right to stand his ground:

> If the State has satisfied you beyond a reasonable doubt that the defendant assaulted the victim with a deadly weapon with intent to cause death or serious bodily injury, then you would consider whether the defendant's actions are excused and the defendant is not guilty because the defendant acted in self-defense.
>
> The State has the burden of proving from the evidence beyond a reasonable doubt that the defendant's action was not in self-defense.
>
> If the circumstances would have created a reasonable belief in the mind of a person of ordinary firmness that the assault was necessary or appeared to be necessary to protect that person from imminent death or great bodily harm and the circumstances did create such belief in the defendant's mind at the time the defendant acted, such assault would be justified by self-defense. You, the jury, determine the reasonableness of the defendant's belief from the circumstances appearing to the defendant at the time.
>
> Furthermore, *the defendant has no duty to retreat in a place where the defendant has a lawful right to be*. The defendant would have a lawful right to be in the defendant's motor vehicle.

(Emphasis added.) These instructions are also consistent with N.C.P.I.–Crim. 308.45A.

Nonetheless, Defendant contends the trial court erred by including the last sentence because it misled the jury to believe that Defendant did not have a lawful right to be on Andre's property, and he had to retreat to his vehicle before he could use self-defense. Again, Defendant relies on *Lee*, where the trial court omitted the

stand-your-ground provision from the self-defense instruction. *See Lee*, 370 N.C. at 676. Unlike *Lee*, however, the trial court here gave complete self-defense instructions that included Defendant's right to stand his ground. *See id.*; *see also Bass*, 371 N.C. at 542. Further, when reviewing the jury instructions in the entirety, we conclude the trial court accurately stated the law by instructing the jury that Defendant had no duty to retreat if he was in a place where he had a lawful right to be. *See Roache*, 358 N.C. at 303. Although the trial court specified that Defendant "would" have a lawful right to be in his vehicle, the trial court did not limit the jury to finding that the *only* place Defendant had a lawful right to be, was in his vehicle. Therefore, the trial court did not err, let alone plainly err, by instructing the jury on Defendant's right to use self-defense.

But even if the trial court did err by failing to instruct the jury that Defendant would have a lawful right to be on the property, Defendant has not shown the jury probably would have reached a different result. Here, the State presented evidence indicating Defendant's use of force was not reasonable under the circumstances. *See Lee*, 370 N.C. at 675. ("[T]he trial court must instruct the jury on a defendant's right to stand his ground, as that instruction informs the determination of whether the defendant's actions were reasonable under the circumstances . . . .").

Specifically, the State presented evidence—through Andre's testimony and Darrel's interview with Detective Lamm—that Defendant shot at Andre before Andre could return fire. This evidence was corroborated by the ShotSpotter report, the

location of Andre's blood on Darrel's vehicle, and the location of the recovered shell casings. Even though there were two witnesses who contradicted the State's evidence that Defendant shot first, "it is the province of the jury to resolve any conflict in the evidence in that regard." *See State v. Lee*, 258 N.C. App. 122, 127 (2018). Consequently, we hold the trial court did not err, let alone plainly err, when it instructed the jury regarding Defendant's right to use self-defense.

## B. Defensive Force Disqualification Jury Instructions

Defendant next argues the trial court plainly erred by instructing the jury Defendant would not be entitled to the benefit of using defensive force if he was committing the felony of possession of a firearm by a felon. Specifically, Defendant argues the trial court plainly erred because the State did not present sufficient evidence to show that there is a causal connection between Defendant's felonious possession of a firearm and the circumstances in which Andre was assaulted, rendering the trial court's instruction regarding Defendant's right to use defensive force misleading.

Defendant acknowledges he did not object to the jury instructions regarding his use of defensive force. We will therefore apply the plain error standard of review. *See Lawrence*, 365 N.C. at 518; *see also Collington*, 375 N.C. at 410.

"[W]hen a defendant in a criminal case claims perfect self-defense, the applicable provisions of N.C.G.S. § 14-51.3—and, by extension, the disqualifications provided under N.C.G.S. § 14-51.4—govern." *State v. McLymore*, 380 N.C. 185, 191

(2022). Section 14-51.4 prohibits a defendant from claiming self-defense if the defendant "[w]as attempting to commit, committing, or escaping after the commission of a felony." N.C.G.S. § 14-51.4(1) (2023).

Recently, our Supreme Court has clarified that, "to disqualify a defendant from justifying the use of force as self-defense pursuant to N.C.G.S. § 14-51.4(1), the State must prove the existence of an immediate causal nexus between the defendant's disqualifying conduct and the confrontation during which the defendant used force." *McLymore*, 380 N.C. at 197. In other words, "[t]he State must introduce evidence that but for the defendant attempting to commit, committing, or escaping after the commission of a felony, the confrontation resulting in injury to the victim would not have occurred." *Id.* at 197–98 (citation and internal quotation marks omitted). Moreover, "our Supreme Court noted 'whether or not a defendant was engaged in disqualifying conduct bearing an immediate causal nexus to the circumstances giving rise to his or her use of force' is ordinarily a jury question." *State v. Townsend*, 299 N.C. App. 132, 137 (2025) (quoting *McLymore*, 380 N.C. at 198).

Here, Defendant concedes he was convicted of a felony in 2009, "[t]he jury could find from the State's evidence that [Defendant] had a firearm in his possession when he exited his vehicle at [Andre]'s house[,]" and he "was committing a felony and would continue to commit a felony until he ceased possession of the firearm[.]" *See* N.C.G.S. § 14-415.1(a) (2023). Further, the State presented substantial evidence from which a rational juror could conclude that, but for Defendant's felonious possession of the

firearm, the confrontation that led to Andre being injured would not have occurred. Specifically, the State presented evidence tending to show Defendant walked up to Andre and Darrel and, after exchanging some words, shot at Andre first. Although Defendant presented evidence that Andre shot first, the determination of whether "a defendant was engaged in disqualifying conduct bearing an immediate causal nexus to the circumstances giving rise to his or her use of force" is generally left to the jury. *McLymore*, 380 N.C. at 198. As such, the trial court did not err, let alone plainly err, by instructing the jury Defendant would not be entitled to the benefit of using defensive force if he was committing the felony of possession of a firearm by a felon.

Further, the trial court properly instructed the jury regarding the causal nexus requirement:

> The defendant would not be justified and is therefore not entitled to the benefit of using defensive force if he was committing the felony of possession of firearm by a felon, as I instructed you previously, and a felony offense was immediately causally connected to the circumstances giving rise to the defensive force used.
>
> As such, for the defendant to be disqualified from the benefit of using defensive force, the State must prove beyond a reasonable doubt, among other things, that the defendant while acting in self-defense was committing the felony of possession of firearm by felon, and *there was an immediate causal connection between the defendant's use of such defensive force and his felonious conduct.* In other words, *the State must prove that but for the defendant committing the felony of possession of firearm by a felon, the confrontation resulting in injury to the victim would not have occurred.*

(Emphasis added.) These instructions are similar to those our Supreme Court

- 20 -

announced in *McLymore* regarding the causal nexus requirement under N.C.G.S. § 14-51.4(1). *See id.* at 200 (providing a "permissible jury instruction" regarding the causal nexus requirement). Critically, after reviewing the jury instructions in their entirety, *see Carwile*, 297 N.C. App. at 157, we conclude the jury instructions accurately stated the law, and are therefore upheld, *see Roache*, 358 N.C. at 303. As such, Defendant has failed to show that the trial court erred, let alone plainly erred, when instructing the jury regarding Defendant's right to use defensive force.

## IV. <u>Conclusion</u>

After careful review, we hold the trial court did not err, let alone plainly err, when instructing the jury regarding Defendant's right to use self-defense where the trial court gave a complete self-defense instruction. Nor did the trial court plainly err by instructing the jury that Defendant was not entitled to the benefit of self-defense where Defendant conceded he was committing the felony of possession of a firearm by a felon, and the State presented sufficient evidence tending to show a causal nexus between Defendant's possession of a firearm and the circumstances in which Andre was assaulted.

NO ERROR.

Judges TYSON and GRIFFIN concur.

Report per Rule 30(e).