[Cite as *State v. Ihinger*, 2014-Ohio-5237.]

COURT OF APPEALS
COSHOCTON COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. William B. Hoffman, P.J.<br>Hon. Sheila G. Farmer, J.<br>Hon. Patricia A. Delaney, J. |
|     Plaintiff-Appellee | |
| -vs- | |
| | Case No. 2014CA0014 |
| JESSICA IHINGER | |
|     Defendant-Appellant | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from Coshocton Municipal Court, Case No. CRB 1400092

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      November 24, 2014

APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant

BY: CHRISTIE M. L. THORNSLEY      MARK A. PERLAKY
Assistant Law Director      111 W. Main St.
760 Chestnut Street      Newcomerstown, Ohio 43832
Coshocton, Ohio 43812

*Hoffman, P.J.*

{¶1} Defendant-appellant Jessica Ihinger appeals her conviction entered by the Coshocton Municipal Court on one count of aiding and abetting theft, in violation of R.C. 2923.03(A)(2). Plaintiff-appellee is the state of Ohio.

STATEMENT OF THE FACTS AND CASE

{¶2} On February 25, 2014, officers were dispatched to Woodbury Outfitters in reference to a shoplifting offense occurring on February 24, 2014. Bruce Adams, the Loss Prevention Manager for Woodbury Outfitters, reported three individuals were involved in a theft offense during which a woman put an old pair of boots in a box and walked out of the store wearing a new pair of boots. A male individual whom accompanied the woman kept watch during the event. At the same time, in the parking lot of the store, a woman exited the vehicle in which the male and female had arrived, walked towards the store entrance, activated the entrance doors, which subsequently allowed the male and female to exit the store without passing the cash registers or exiting properly via the exit doors. Adams testified without the women's assistance in activating the entrance doors, the male and female perpetrators would not have been able to activate the entrance doors from inside the store.

{¶3} On March 4, 2014, Appellant was charged with one count of aiding and abetting another in committing a theft offense, in violation of R.C. 2923.03(A)(2).

{¶4} The matter proceeded to a bench trial on May 7, 2014. Appellant was found guilty of one count of aiding and abetting a theft offense, in violation of R.C. 2923.03(A)(2). The trial court sentenced Appellant to thirty days in jail and a fine of $150.00.

**{¶5}** Appellant appeals, assigning as error:

**{¶6}** "I. THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY, AS SAID FINDING WAS BASED ON INSUFFICIENT EVIDENCE.

**{¶7}** "II. THE TRIAL COURT ERRED IN FINDING APPELLANT GUILTY, AS SAID FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

## I. and II.

**{¶8}** Appellant's first and second assignments of error raise common and interrelated issues; therefore, we will address the arguments together.

**{¶9}** Appellant maintains her conviction for aiding and abetting a theft offense is against the manifest weight and sufficiency of the evidence.

**{¶10}** Our review of the constitutional sufficiency of evidence to support a criminal conviction is governed by *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which requires a court of appeals to determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.;* see also *McDaniel v. Brown,* 558 U.S. 120, 130 S.Ct. 665, 673, 175 L.Ed.2d 582(2010) (reaffirming this standard); *State v. Fry,* 125 Ohio St.3d 163, 926 N.E.2d 1239, 2010–Ohio–1017, ¶ 146; *State v. Clay,* 187 Ohio App.3d 633, 933 N.E.2d 296, 2010–Ohio–2720, ¶ 68.

**{¶11}** Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins,* 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith,* 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355. Weight of the evidence concerns "the

inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue, which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis sic.) *Id.* at 387, 678 N.E.2d 541, quoting Black's Law Dictionary (6th Ed.1990) at 1594.

{¶12} When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "'thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Id.* at 387, 678 N.E.2d 541, quoting *Tibbs v. Florida,* 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins,* supra, 78 Ohio St.3d at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶13} "[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

{¶14} * * *

**{¶15}** "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment."

**{¶16}** *Seasons Coal Co., Inc. v. Cleveland,* 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984), fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191–192 (1978).

**{¶17}** Appellant was convicted of aiding and abetting a theft offense for her part in activating the outside entrance doors, allowing the male and female perpetrators to exit the store without passing the cash registers or through the exit doors.

IDENTIFICATION

**{¶18}** Deputy Wesley Wright Eppley of the Coshocton County Sheriff's Office testified at trial as to the identification of the defendants, in this matter:

"Q. How did you find out who these people were?

"A. While at Woodbury, I was advised that they had posted pictures of the individuals that were in the store on their Facebook page, within their Facebook wall. Within a matter of a half hour, an hour, they had received probably 100 messages on Facebook identifying who these people were. The store owner at Woodbury received an e-mail from a female by the name of Diana McManaway (phonetic), who was an aunt to John Ihinger. While in the store, the male that was in the store actually called and was on the phone with Bruce Adams wondering why his picture was on their Facebook wall. Bruce explained to him why it was on there. And he tried to tell Bruce that he was in the store and had no idea what

was going on and doesn't know who the female in the store was that wore the boots out.

"Q. That would be the person that just pled guilty in the last case?

"A. Yes. Yes, it was. At that time, he was advised that he needed to come to the Sheriff's Office to speak with me. And Bruce advised him that he needed to come talk to me. And he never did come talk to me.

"Q. Did you ever make contact with any of the three individuals?

"A. I wanted to make contact, but no contact was ever made.

"Q. So how did you get them charged?

"A. I sent up an order for The Court to issue warrants for the three subjects.

"Q. So today is the first time you have ever seen the Defendant; right?

"A. Yes.

"Q. Other than on video?

"A. Yes."

**{¶19}** Tr. at 9-11.

**{¶20}** After review of the video, we find it is impossible to identify Appellant from the video. And while Deputy Eppley testified as to "what" he saw on the video, he never identified "who" the third person was based solely on the video.

**{¶21}** Bruce Adams testified as to the identification,

"Q. Did you know who these individuals were?

"A. No.

"Q. So what did you do to try and gain their identity?

"A. Well, the boss was really upset when I showed him the film. He said, 'Here's what we're gonna do. We're gonna put them on Facebook.' And at that point we proceeded to get a flood of identities as to who they were and everything; friends, relatives, all kinds of people notified us as to who the perpetrators were.

"Q. Did one person, one relative in particular, notify you?

"A. Yes.

"Q. What did they notify you?

"A. Well, she's the one that, because it was a relative, she says, 'There's no doubt in my mind who is on there,' you know. At that point that helped a lot, you know.

"Q. Did any Defendants call you?

"A. Yes. That Defendant said that he had no idea who that person was, the female especially.

"Q. And that would be John Ihinger?

"A. Yeah.

"Q. That was the individual that was just in here in court in the previous case?

"A. Yes.

"Q. He said he had no idea who this Defendant was?

"A. No. The gal that took the boots, had no idea who it was.

"Q. Yet he came in the same car with her?

"A. Yes.  Yeah.  I called him on that one, too, by the way.

"Q. And what did he say?

"A. He went silent at that point.

"Q. Okay.  What other conversation - -

"THE COURT: He what?

"THE WITNESS: He went silent at that point.

"THE COURT: Went silent, okay.

"MR. SKELTON:

"Q. What other conversations did you have with Mr. Ihinger?

"A. That was pretty much it for myself.

"MR. SKELTON: Okay.  I have no further questions."

**{¶22}** Tr. at 35-36

**{¶23}** Diana McManaway, John Ihinger's aunt, testified at trial,

"A. So I had gotten this phone call from a stranger and they had told me to go to what I understood was Woodbury's web site.  Okay?  Well, I went there because they asked me if I knew John Ihinger.  I was like, 'Yeah.  Well who are you?'  'Well, don't worry about it.  Go to this web site.'  So I had went to Woodbury's web site.  I couldn't find anything.  So I had called the store and asked them and told them what kind of phone call I got.  She said, 'You're only about the tenth person that's called me today that's got that same phone call.  Go to our Facebook page.'  I went to the Facebook page.  That's where I saw Johnny and Kimberly.

"Q.  So what did you do?

"A. I called Coshocton and I was talking to a deputy and I told them I knew them.

"Q. You said Johnny and Kimberly.  Who is Kimberly?

"A. Kimberly Frame is our cousin.  She's family, too.

"Q. Okay.  So all three individuals charged in this are related?

"A. Yes.  Johnny and Kimberly are cousins.  Jessie and Johnny are married.

"Q. Okay.  What did you tell Woodbury?

"A. That I knew the guy and the girl in the picture that I had saw. And he asked me if I had any current pictures of them.  And I told him yes and I sent them.

"Q. Did you tell them anything about John and Jessica making a living?

"A. Yes.  This is not - - with Johnny, this goes back to when he was 13 or 14 years old.  That's how he's been taught."

**{¶24}** Tr. at 47-49.

**{¶25}** Ms. McManaway's testimony was then interrupted by objection and the questioning stopped.  She did not identify Appellant as an individual on the surveillance video nor as being pictured on Woodbury's Facebook page as a picture of Appellant's face could not be put on Facebook because she never passed the second set of entrance doors into the store.  The State did not introduce any other evidence to identify Appellant as the female individual on the surveillance video of the incident.

**{¶26}** The trial court later raised the issue of identity at trial,

"THE COURT: Mr. Skelton, did you focus on identification of this Defendant for this offense? Because I am a little weak on that. I don't know how we - - I looked at the video. I saw a person get out of the - - some person come up there. And, you know, there was some indication that these people were identified on Facebook, but I don't remember anybody saying that was the person, that she was absolutely that person or they were sure that was her.

"MR. SKELTON: Deputy Eppley and Mr. Adams both testified that Woodbury received countless tips as to who all three individuals were and specified who all three individuals were, and so that's their identification.[1] Their identification came from the aunt identifying her today. And she looked on Facebook and said, 'Yep, that's these three people; husband, wife, cousin.' As far as the time lapse - -

"THE COURT: Hold on. I remember her saying that was her nephew, Johnny. Well, I guess she did say that - -

---

[1] The record does not support the State's assertion Deputy Eppley and Mr. Adams testified countless tips identified all "three" individuals or specified who all "three" individuals were. Deputy Eppley said probably 100 messages were received on Facebook identifying who "these" people were (Tr. p. 10). "These" people were the individuals that were in the store (Tr. p. 9), namely the co-defendants, John Ihinger and Kimberly France, whose pictures were posted on Woodbury's Facebook page. Likewise Mr. Adams testified they got a flood of identifications of who "they" were; not who the "three" were (Tr. p. 35). As noted *supra*, Appellant's picture was not posted on Woodbury's Facebook page.

Similarly, while Diane McManaway indicated she saw Johnny and Jessie on the Facebook page (Tr. p. 47), when her testimony is read in toto, it is clear she only saw Johnny and Kimberly on the Facebook page (Tr. p. 48).

"MR. SKELTON: The other woman in the store was Kimberly Frame, Johnny's cousin, and the woman who came up to the doors was the Defendant.

"THE COURT: Okay."

**{¶27}** Tr. at 61-62.

**{¶28}** Appellant's counsel did not respond at this point to the prosecutor's argument or to the trial court's inquiry concerning identification, although he later raised the issue of identification in closing argument.

**{¶29}** Solely upon our review of the testimony set forth above, we would find the State did not sufficiently establish the identity of Appellant as the third female actor in the theft at issue. The State did not identify Appellant as the actor on the video as you could not view Appellant's face in the video and none of the witnesses identified Appellant at trial. Deputy Eppley and Bruce Adams testified to the posting of photographs on Facebook, but did not testify to how they identified Appellant or as to a particular individual identifying Appellant from the photographs or video. Ms. McManaway did not identify Appellant from the photographs or video; rather, she limited her identification to the male and female perpetrators inside the store. The State failed to introduce testimony or evidence indicating Appellant was in the pictures posted on Facebook or establishing Appellant was specifically identified by any named individual via the Facebook posting. Further, while Diana McManaway, John Ihinger's aunt, sufficiently identified John Ihinger and his cousin, she did not identify Appellant in the Facebook posting, and did not identify Appellant in her testimony as an actor in the theft

offense.  It appears everyone only assumed Appellant was the third individual involved because of her relationship to John Ihinger.

**{¶30}** However, our inquiry does not stop there.  During cross-examination of Deputy Eppley, Appellant's counsel repeatedly referred to the third person involved (the one who never entered past the second set of entrance doors) as "Jessica".  (Tr. P. 13-15)  While such may not amount to a stipulation of identification, we find it constitutes a tacit admission or concession of identify such to support the verdict when considered with all the other evidence.  Such tacit admission/concession cannot simply be retracted during closing argument after the opportunity for presentation of evidence has concluded.   It seems clear Appellant's theory of defense was not to challenge identification (until closing argument after prompting by the trial court as noted, *supra)*, but rather to challenge whether Appellant's action triggering the door constituted aiding and abetting.

AIDING AND ABETTING

**{¶31}** Appellant was convicted of aiding and abetting a theft offense, in violation of R.C 2923.03(A)(2), which reads,

> "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:***

> (2) Aid or abet another in committing the offense;

> (F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense.

**{¶32}** The offense of theft is defined at R.C. 2913.02(A),

**{¶33}** (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:***

**{¶34}** Upon review of the evidence and testimony presented at trial, including the video tape introduced at trial, we find Appellant's conviction for aiding and abetting a theft offense is not against the manifest weight nor sufficiency of the evidence. The video surveillance introduced at trial clearly depicts Appellant leaving the vehicle within a short period of time after the male and female perpetrators. She approaches the first set of entrance doors, then steps inside the store entrance; thereby, activating the second set of entrance doors. The video surveillance indicates the second set of entrance doors did not close prior to her co-defendants exiting the store, allowing them to leave the store without passing the cash registers and without properly exiting the store. Deputy Eppley testified at trial the boot section was closest to the entrance doors of the store. The perpetrators would have otherwise been unable to exit the store during the time period without passing store employees at the cash registers and through the exit doors. Tr. at 7-8. Bruce Adams testified as long as the door is all the way shut, it stays locked. If the doors do not shut all the way, they will not lock. Tr. at 33. When Appellant activated the motion sensor doors, she made sure they stayed open, and the perpetrators were able to get out of the store. Tr. at 33. The doors stayed open, did not lock, and the defendants were able to exit from the inside through the entrance doors. Therefore, Appellant's actions enabled the male and female to exit the store easily and improperly; thereby, aiding and abetting the theft offense.

{¶35} Appellant's conviction in the Coshocton County Municipal Court is affirmed.

By: Hoffman, P.J. and

Delaney, J. concur;

Farmer, J. concurs separately.

*Farmer, J., concurs*

{¶36} I concur with the majority's opinion, but would find that Deputy Eppley's identification of appellant at T. at 7 established the identity of appellant.